CHARLES LAKIN *vs.* WILLIAM AMES & another.

In Massachusetts real estate originally granted to a parish, upon the subsequent incorporation of the parish into a town, will pass to, and be held by, the new corporation.

If the town be subsequently divided into parishes, such property will not revert to the original parish, if in the mean time it has been exclusively appropriated to the use of the town in its municipal capacity.

Such appropriation to municipal purposes would be clearly indicated either by a vote of the united corporation, or by a long continued use for purposes with which a parish has no concern, such as for a town-house, school-house, gun-house, and the like.

A license from the united corporation of town and parish to build a tomb in the burying-yard, conveys also a right of suitable access thereto; and a removal of an obstruction thereto, by the owner of the tomb, is not a trespass.

A license from a mother to a son, to open the family tomb to deposit the corpse of a deceased son, will be implied from the relation of the parties, the exigencies of the case, and the usages and customs of a civilized community.

TRESPASS for tearing down a horse shed, the property cf the plaintiff, and carrying away the materials.

The defence was, that the shed in question, with others, was unlawfully on the public common of the town of Pepperell; that said town ordered the same to be removed, and that the defendants did so, acting under such orders; and secondly, that the shed was so erected in front of a tomb, lawfully on the burying-ground adjoining said common, as to obstruct the entrance thereto, and that the defendant Ames, having the legal right to open said tomb, and deposit a corpse therein, peaceably removed the shed for that purpose, doing no unnecessary damage.

The case was submitted to the court of common pleas, *Mellen,* J. and by appeal to this court upon an agreed statement of facts, the most material of which relating directly to the trespass alleged are as follows:

The first parish in the town of Pepperell, on the 24th September, 1849, voted that the inhabitants and members thereof might build sheds on the common for their own use, and at their own expense, under the direction of a committee, chosen by the parish for that purpose. A row of sheds was accordingly built, extending from the meeting-house nearly to the easterly side of the common, the rear of the sheds being about five feet from the wall of the burying-yard, which wall separated said yard from the common, and the plaintiff's shed was so situated as to obstruct the entrance to one of the tombs in the burying-yard, which tomb had been built in 1810, by Jonas S. Varnum, and was at the time of the alleged trespass, namely, March 16, 1850, owned by his heirs, of whom the mother of the defendant Ames was one. On that day, said Ames had occasion to open the tomb for the burial of his brother, then lying dead in the house in which said Ames and his mother resided. He applied to the selectmen of the town of Pepperell, for leave to remove said shed, in order to obtain access to said tomb, and the other defendant, Samuel Farrar, as chairman of said selectmen, gave him permission so to do, whereupon he took it down, doing no unnecessary damage, and piled up the materials in the yard; which is the trespass complained of.

The plaintiff did not admit that the defendant Ames, himself had any legal interest in said tomb, or that he had any express authority from his mother, one of the heirs of the former owner, Jonas S. Varnum, to open said tomb, and such express authority was not asserted by the defendants.

Neither did the plaintiff admit that the town had such interest in the burying-yard, or common, that they could authorize the erection of the tomb, or could direct the removal of the sheds on the common, and the main question in the case was, whether the control over the common was in the first parish in Pepperell, or in the town of Pepperell.

For the purpose of determining this question, the following facts (among others) were agreed:

That part of the present town of Pepperell, west of the Lancaster River, formerly a part of the town of Groton, was set off by vote of said town, and organized as the west parish in Groton, January 19, 1742. On the 19th February, 1745, the said west parish voted to erect a meeting-house on a place " perfixed " by a committee of the general court, and th ɔ same was soon after erected and used by said west parish.

On the 20th November, 1746, Thomas Tarbell conveyed to William Farnsworth, as appears by the proper record, forty-three and one-fourth acres of land in Groton, described by metes and bounds, " always excepting and reserving two acres to be taken out in a regular form, where the meeting-house now stands, in the west parish in said town, as the said Tarbell shall order."

No deed can be found of any part of the original common or burying-ground in Pepperell, expressly naming it as such, but said common and burying-ground was near the said meeting house; it contained two acres, and was in the form of a parallelogram.

April 12, 1753, the said west parish in Groton, or second precinct in Groton, was by the general court incorporated into a separate district by the name of Pepperell, with all the rights and powers of a town, except that of sending representatives to the general assembly; and in the present case, the municipal corporation is called either a town or a district.

The first meeting of the Pepperell district was May 29, 1753, at which it was voted "to confirm and establish what was voted in Groton west parish, last March, concerning the burying place." This vote, however, did not show precisely what was the vote of March previous; this is the first mention of the burying-place to be found in the records of the district of Pepperell.

At a meeting of the district, October 8, 1753, "voted, that the nearest place to the meeting-house that is convenient for the school to be kept in, be the place;" and the sum of 7*l.* 10*s.* was raised for the use of the school, and a committee appointed to provide a schoolmaster, and a place for the school to be kept in.

At another meeting of the district, March 5, 1755, it was voted, "that the burying-ground be fenced according to the former votes, passed in a parish meeting, March 7, 1753,"— (probably the votes before referred to;)—also voted to appoint a committee to "fix the bounds of the burying-place and measure off the same":—"to fence the burying-place with a wall four and a half feet high, and twenty-four feet from the meeting-house, &c."

From 1753, the time of its incorporation as a separate district by the name of Pepperell, until November 13, 1831, the time of the division of the town into parishes, by the organization of a second parish, as hereafter stated, the meetings of the district or town, both for parochial and municipal business, were held in the meeting-house; and the records of the meetings held during that period, contain many votes indicating the action of the corporation concerning the common and burying-ground in question. The most material of these votes, are these:

At a meeting March 2, 1762, it was voted, that the transcript of a road be recorded, which was laid out by the selectmen January 5, 1762, which, after other courses, crosses Simeon Green's field, "northwardly to the west of a tree marked on the common near said Green's fence; then joining on the common to the west of the marked trees as they direct through said common." This is the first mention of the

*common in the records.* The meeting-house is not mentioned in the record in connection with it.

September 19, 1763, voted "to have the burying-ground poled upon the two fronts, and to choose a person to take care of the burying-yard." March 3, 1766, voted "to choose a committee to take care that the common be not encroached upon."

December 21, 1767, it was voted that the selectmen set the widow Rolfe's house in some proper place on the common.

March 3, 1768, voted to warn the district meetings for the future by posting. Also voted, to fix a post at the northeasterly corner of the school-house for that purpose.

From 1767 to 1769, there are various votes concerning the old meeting-house and the erection of a new one, and the town voted, November 22, 1768, that a committee have liberty to dig stone from "the district's common," for the under pinning of a new meeting-house, and in 1769, a new house was erected by vote of the district or town, on the site of the old one, but facing south instead of west. The upper part was used as a storage for military stores, required by law to be kept by the town.

In 1774, it is entered of record, by direction of the selectmen, among other things, that the people of the district, on the 29th day of August, 1774, prepared and raised a liberty pole, on the common, directly before the meeting-house door.

September 5, 1774, the selectmen of the town approved of a tavern kept on the common by Solomon Rogers.

In a town meeting March 6, 1810, it was voted that "Captain Samuel Parker and others, and their heirs and assigns, may improve forever, the ground in the southwest part of the burying yard, that they have built four tombs upon, the year past, and numbered 4, 5, 6, and 7."

In a town meeting May 7, 1810, it was voted, "that Jonas S. Varnum and others, have liberty to build two or more tombs in the graveyard, under the direction of the selectmen." In pursuance of this vote, Jonas S. Varnum and others, under the direction of the selectmen, built four tombs in the southerly side of the burying-ground, next to the wall separating it

from the common. The entrance to the most westerly one of the four, which was next to the burying-yard gate, was within the burying-ground; the entrance to the other three being made within the common, so as to pass under the burying yard wall into the tomb.

At different town meetings held from April 1, 1817, to April 10, 1821, liberty was given to different individuals to erect tombs in the graveyard, under the superintendence of the selectmen of the town.

May 7, 1821, a committee previously appointed to view the wall around the burying-yard, reported, that the owners of the several tombs repair their walls at their own expense, and that the remainder of the wall be decently repaired or rebuilt at the expense of the town.

At a meeting May 2, 1825, a committee previously appointed for the purpose, reported in favor of rebuilding and straightening the wall on the west side of the burying-yard.

In a town meeting March 7, 1826, it was voted to have the common near the meeting-house made more level and smooth, and trees set out in convenient places for ornament and shade, provided the same be done without expense to the town, and under the superintendence of a committee to be appointed for the same by the town. The common was levelled, and trees were planted accordingly.

September 23, 1826, the town voted to alter the wall then on the easterly side of the common, and have the same placed on captain Nathan Shipley's line, and under the direction of the committee. In consequence of this vote, a wall was built on the line of Shipley's land, which formed the easterly foundation wall for a row of horse-sheds erected by individuals on land, which they had purchased of Shipley, adjoining the common, and a strip of land eighteen feet wide, was added to the common by means of this arrangement. These horse-sheds are on the easterly side of the common. At the same meeting it was voted " to move the hearse-house, by having land given to place the same upon, and the ground where it now stands to be given for the use of the town." The original hearse house before that time had stood on the northerly side of the

common, and the only access to it was from the common. Some other facts concerning the common during the period aforesaid, from 1753 to 1831, the time of the division of the town into two parishes, and subsequent thereto, were agreed upon as follows, namely : That the common has, from the organization of the militia to the present day, been uniformly used as the common training field for the militia of the town of Pepperell, and the soldiery have been warned to appear on the public training field and have met on the common. So far back as the recollection of the oldest inhabitant extends, the common and the burying-ground have existed in the same form, except some recent additions, and the common has been known by the names of "Pepperell Common," "Public Common," "Public Training Field," &c. The common has not been enclosed, and every person has driven across it, in any direction as he pleased; and it is crossed by three defined public travelled ways. There are two entrances to the burying-ground, the one on the south from the common, the other on the west from the highway, both of which have existed as far back as any person recollects. Funeral trains, having occasion to enter the south gate, have always driven across the common from every direction, and stopped upon the common in such places as they found most convenient. Persons attending meeting at the meeting-house standing on the common, sometimes tied their horses upon different parts of the common, and, after the building of the second parish meeting-house, this was done in some instances by persons attending meeting at the second parish.

From 1815 to 1830, there were, at several times, caravans and circus exhibitions, and Fourth of July dinners, and fireworks upon the common. The caravan, one of the dinners at least, and the fireworks, were on the common, in front of the meeting-house. At several different times after the separation of the town into parishes, (which was, as before stated, in 1831,) the common has been used for shows, political speeches, &c., as before the separation. No objection to the control of the common by the town appears to have been made until recently.

There was formerly a school-house on the south side of the road on the south side of the common, which was moved down the Groton road; after which a new one was built on the east side of the common, and, since 1821 or 1822, has stood there at a short distance from the burying-ground, the only entrance to it being from the common, and the common was used as a play-ground. There is a private house on the easterly side of the common, to which there is no access other than over the common, and no particular way or path from other roads to it is habitually used. Those having occasion to go to and from this house, take their own way as they see fit. This house is not a modern one, but it is not known how long it has stood there. There is also a house and store on the southerly side of the highway, on the south side of the common, built more than a half century since. There are also houses on the west side of the common. None of them are modern houses. One of them is the building formerly occupied by Rogers for a tavern, as before mentioned.

On the 13th November, 1831, as before stated, the town of Pepperell was divided into parishes, by the organization of a second parish, and the defendants claimed that the control of the common and burying-ground continued in the town of Pepperell after such separation, and did not revert to the first parish under whom the plaintiff claimed a right to maintain and continue the shed in question. On this point the following facts were agreed:

In a town meeting November 24, 1832, it was voted to grant liberty to Captain Lemuel Parker, to place a sign-post upon the common, under the direction of the selectmen. In pursuance of this vote, he immediately after erected a sign-post on the southwest corner of the common, which stood there till 1839 or 1840.

In a warrant for a meeting March 4, 1834, there is an article to " see if the town will vote to give leave to Timothy Nutting and others, to build some horse-sheds on some convenient part of the common; " also another, to " see if the town will vote to give leave to Luther Tarbell, Jr., to place a hay scale in some convenient place on the common; or act

any thing relative to any incumbrance that is now on the common." On both these articles the town voted to leave the matter to the discretion of the selectmen, who refused to allow the erection of either a hay scale or sheds.

In a meeting November 10, 1834, it was voted, "that the selectmen have care of the burying-ground so far as respects the fence and the gates, and that the gates be kept open on the Sabbath, and that each parish have a sexton, and each sexton be provided with a key that will unlock the locks to the gates of the burying-ground and the hearse house." Each sexton was supplied with a key as directed in said vote. The burying-ground has, from that time to the present, remained under the care of the selectmen in accordance with the vote, and has been mowed yearly under their direction.

In the warrant for a meeting March 3, 1835, is an article to see if the town will repair or build anew the burying-yard wall, or act any thing thereon; upon which a committee was appointed, who, at a subsequent meeting, April 6, 1835, reported their unanimous opinion that the wall on the west side ought to be rebuilt, and that it ought to be moved into the yard at the south end about five feet, and in a line with the front wall of the tombs at the north end of said yard. The report was accepted. About this time, the town repaired the wall on the east side of the yard.

Upon an article in the warrant for a meeting March 1, 1842, to see what method the town will take to enlarge or provide a burying-place, a committee was appointed, who subsequently reported that a lot owned by John Blood might be had, and it was voted that the selectmen be a committee to lot out the land, and make writings, and take charge of the same for the town.

At a meeting November 8, 1847, upon an article to see if the town will take any action with regard to the burying-yard wall, a committee was appointed, who reported at a meeting in March, 1848, among other things, that an acre and a half of land could be procured as an addition to the burying-ground, on the easterly side of the burying-ground, which report was accepted. A committee of twelve was appointed

to carry it into effect, and take charge of the whole subject, and the one and a half acres of land on the easterly side of the burying-ground was purchased as an addition to it, and the wall on the east side of the old burying-ground, between it and the new purchase, has been taken down, and the hearse-house, which formerly stood on the old lot, has been removed and placed upon the new, and the entrance to this part of the burying-ground is from the northeast corner of the common.

In 1849, as before stated, the sheds in question were erected on the common, in accordance with a license from the first parish in Pepperell. At the time the workmen were laying the underpinning for the sheds, the defendant, Samuel Farrar, chairman of the selectmen, forbade them to proceed with the work, which fact they communicated to Ivers J. Harvey, one of the parish committee, appointed to superintend the erection of the sheds. At the same time, Jonas Smith acting on behalf of the tomb owners, forbade the workmen to go on.

Upon the report of a committee appointed December 17, 1849, the town voted, January 21, 1850, " that the selectmen be required to carry into effect the report of the committee, and remove the horse-sheds at the expense of the town."

At a meeting of the town, held March 5, 1850, after a further report from the committee, the town voted " that the selectmen notify the shed-owners to remove their sheds forthwith, and if they did not, then the selectmen should see that the said sheds be removed within a fortnight from this day peaceably." The shed-owners were notified, but did not move them.

To obtain an entrance to one of the tombs, as before stated, one of the sheds was removed by the defendant, Ames, and the town afterwards voted to confirm what had been done.

Upon these facts, the court of common pleas rendered judgment for the plaintiff, and the defendants appealed to this court.

*H. M. Parker,* (*J. Parker* with him,) for the defendants.

In order to maintain the action, the plaintiff must show a right to have the shed remain in the place where it was situated, as against the defendants.

The burden is on the plaintiff, and he attempts to sustain his right through the first parish in Pepperell, and by his own possession.  But the evidence fails to show such right in the parish, and he had no possession which can avail him.

It appears from the case that on the division of the town of Pepperell into parishes, in 1831, the common belonged to the town ; and even if it did not, the action cannot be sustained.

I. The evidence shows a conveyance of the land to the town, for the purposes of a common, and a dedication thereby to the public.  *Emerson* v. *Wiley*, 10 Pick. 310 ; *Commonwealth* v. *Fisk*, 8 Met. 238, 243 ; *State* v. *Trask*, 6 Verm. 355, 364.

II. The evidence failing to show that the common was conveyed to Groton West Parish, but showing on the contrary, by presumption, that it was conveyed to Pepperell district or town, or dedicated to the public, there is nothing to show that it was conveyed for parochial purposes, or so appropriated ; and the case for that reason, is not within any of the cases under which parishes have sustained a right to property which had been held by the town.

III. If, however, it might be inferred that the common was conveyed to Groton West Parish, it does not appear, even upon that supposition, that it was conveyed for parochial purposes, and of course there can be no inference that the town received it for such purposes.

IV. Upon the supposition that the common was conveyed to Groton West Parish, and for parochial purposes, the first parish in Pepperell can derive no title or benefit from that fact, for the reason, that it is not a successor to Groton West Parish, nor is there any privity between them.

Pepperell district succeeded to the property of Groton West Parish.  The district was a town, except that it did not possess the privilege of sending a representative, which it soon after acquired.  The town appropriated the common to municipal uses, and upon the separation into parishes in 1831, held it in its municipal capacity.  This appears from divers considerations.

1. The town took as a town, without any limitation as to use, and while there was no provision by statute giving any

thing to a parish upon a division. The town acquired a vested right to the property, and held it for the general use of the inhabitants, with no distinction respecting parochial uses The statute of June 28, 1786, does not apply to such a case. *First Parish in Medford* v. *Pratt*, 4 Pick. 222, is distinguishable.

2. Admitting that the meeting-house was parochial, and that the common was a means of access to it, that will not affix a parochial character to the common. It was equally at least a means of access to the burying-ground and tombs. And the burying-ground was held by the town in its municipal character, and the tombs in trust, for private individuals, and are still so held. *First Parish in Shrewsbury* v. *Smith*, 14 Pick. 297; *Stearns* v. *Woodbury*, 10 Met. 27.

3. If it were held that the burying-ground was parochial, and belonged to the first parish, it cannot carry the common with it. There is no conveyance to connect them together. The circumstances show that they were probably conveyed separately, if any conveyance was made; and the use of the common, as a means of access to the burying-ground, is but one of the uses to which it was devoted. The means of access to the tombs, and all the other uses except that of passing to the meeting-house, are private and municipal rights and uses, as shown by the case. The town dedicated it to the public.

4. If a debt had existed in 1831, for the purchase of the common, under the circumstances disclosed by the case, it would have been the debt of the town, under the 4th section of the statute of 1786. 1 Mass. Statutes, (ed. 1801,) 327.

If a meeting had been held immediately before the separation into parishes, to consider whether the town would sell the common, all the inhabitants of the town would have been entitled to vote, notwithstanding the statute of February 3, 1818. 7 Mass. Statutes, (1818,) 475.

V. The undisputed control of the common and burying-ground by the town, long after the separation, serves to show how it was held. The parish cannot now deny its municipal character. The parish has dedicated it to the public, and is estopped to set up a title to it, by reason of the subsequent

18 *

proceedings. *Abbott* v. *Mills*, 3 Verm. 526, 528; *State* v. *Trask*, 6 Verm. 365.

VI. If the title to the common is in the parish, it is subject to the right of the town to use it for all the purposes for which it was used before, and at the time of, the separation, at least, all which are of a continuing character, and to the rights of those having an interest in the tombs to use for the purposes for which they were built; and the parish or its grantees have no right to erect horse-sheds there to the obstruction of the use.

1. If the town might have appropriated it wholly to secular purposes, it might do so in part, and to the extent to which it did so, the use is in the town. *Goff* v. *Rehoboth*, 12 Met. 26, 29.

2. The owners of the tombs, and those interested in burials there, held by private rights. The burying-ground has been made municipal—private—thus far at least. The use of the common in connection with these tombs,—the right of way,— is a private right, held as an incident to the grant, and to the erection of the tombs, of which those interested cannot be deprived by parish or town.

VII. If, on the statement, it should appear to the court that there is no sufficient evidence that Tarbell ever conveyed the land to the town, but that the presumption is that it was dedicated to the public use; that dedication cannot be presumed to be to a limited use; it was not to the parish uses, but to the public generally; the result is the same, and the shed was a nuisance. *Pomeroy* v. *Mills*, 3 Verm. 279; *Abbott* v. *Mills*, 6 Verm. 355; *Emerson* v. *Wiley*, 10 Pick. 310; *Cincinnati* v. *White*, 6 Pet. 435; *Trustees of Watertown* v. *Cowen*, 4 Paige, 513; *Hunter* v. *Trustees of Sandy Hill*, 6 Hill, 407; *Beatty* v. *Kurtz*, 2 Pet. 566; 1 Mass. Stat. (ed. 1807,) 374; Rev. Sts. *c.* 24, § 61; *Stetson* v. *Faxon*, 19 Pick. 147; *Jarvis* v. *Dean*, 3 Bing. 447.

VIII. The plaintiff shows no title to the shed.

1. It was not built according to the vote of the parish, which gave a personal privilege to build for use.

2. The plaintiff shows no possessory title.

3. If he had possession, mere possession of a nuisance will not sustain the plaintiff's case.

4. The possession of the town was prior to any possession of the plaintiff.

IX. The defendant Ames was well authorized to abate the nuisance, as an inhabitant, and as one having the authority of the town.    He had also a private right to remove the shed in the exercise of the right of burial.    *James* v. *Hayward,* Cro. Car. 184;    *Arundel* v. *McCulloch,* 10  Mass. 70;  Sullivan on Land Titles, 293.

X.  The  defendant Farrar has done no act which can make him responsible, in any view of the case.    He consented, as a selectman, to the removal.

*J. G. Abbott,* ( *G. F. Farley* with him,) for the plaintiff.

1. The plaintiff claims under a grant from the first parish in Pepperell, and if that corporation had the property in the common, and the right to appropriate it for the building of horse-sheds, he is entitled to recover.

2. The property in the common and burying-ground first vested in the west parish in Groton; that parish was organized in 1742, a meeting-house was built where the present one now stands, and it was not until 1753 that the parish became a district with municipal powers.

3. From 1753 till 1831, the parochial and municipal affairs of Pepperell were all transacted together; at the last date, the parish became a separate corporation, and all parochial property heretofore held by the town passed to it.    *First Parish in Medford* v. *Pratt,* 4 Pick. 222;  *Baker* v. *Fales,* 16 Mass. 488;  *First Parish in Medford* v. *Inhabitants of Medford,* 21 Pick. 199;  *Inhabitants of Milton* v. *First Con. Parish in Milton,* 10 Pick. 447;  *Milford* v. *Godfrey,* 1 Pick. 91.

4. If the common and burying-ground belonged to the parish before its erection into a municipal corporation, then, upon the separation of the town and parish, the latter would hold all the property belonging to it before its union with the town. *Tobey* v. *Wareham Bank,* 13 Met. 446;  *Ludlow* v. *Sikes,* 19 Pick. 317.

5. The use of the common about the meeting-house for a training-field and other purposes of the like kind, would not divest the parish of its property in it upon the separation

of town and parish. *First Parish in Gloucester* v. *Beach*, 2 Pick. 60, note; *First Parish in Shrewsbury* v. *Smith*, 14 Pick. 297.

6. The mere passing over the common by the public, for any length of time, will not establish the right against the parish. *Emerson* v. *Wiley*, 7 Pick. 70; *First Parish in Gloucester* v. *Beach*, 2 Pick. 60, note.

7. The defendant Ames cannot justify here as an owner of the Varnum tomb; he had no legal right of property in it; and it is not proved that he acted under the direction of the person having the right.

8. The permission given by the selectmen, shows that the defendant Ames was not acting as agent of the owner of the tomb, but under the authority of the town.

9. The grant to build the tombs, gave no authority to open them into the common out of the graveyard, or to exercise any control over the burial-ground. *Price* v. *Methodist Episcopal Church*, 4 Ham. 515.

10. The time when, and the circumstances under which, the burying-ground was laid out and appropriated as such, and its proximity to the meeting-house, all seem to designate it as parish property for parochial purposes and pious uses. *Beatty* v. *Kurtz*, 2 Pet. 566.

BIGELOW, J. The defendants in the present case seek to justify the alleged trespass on two grounds. The first is, by proof of title in the town of Pepperell to the common and burying-ground in question, with its appurtenances, and a license from said town to enter thereon and do the acts complained of. The second is, by evidence of ownership or right in a tomb in said ground, vested in the mother of one of the defendants, as one of the heirs of Jonas S. Varnum, and a permission or authority from her to open said tomb, for the purpose of depositing therein the body of a deceased son.

In support of the first-named ground, a great mass of evidence has been introduced by the parties, concerning the organization of the first parish in Pepperell, and the incorporation of said town, and respecting the origin and uses of the common on which the meeting-house of said parish is situated.

and from which the burying-ground was originally taken and set apart. But as the facts most important and decisive in the determination of the main question of title to the common, can be ascertained only by reference to a period of time comparatively remote, the case on this point is necessarily involved in some obscurity and doubt. The lapse of more than a century has obliterated landmarks, destroyed memorials and documents, and rendered records uncertain and difficult of interpretation. The only mode under such circumstances, of determining the rights of parties to the property in dispute, is by having recourse to those presumptions and inferences, which courts of law are authorized to make in the absence of more direct and positive proofs.

The tract of land now forming the principal part of the town of Pepperell, was organized and established as the west parish of the town of Groton, in the year 1742, and under the authority of the general court of the province, a place was designated for the erection of a meeting-house thereon, in 1744. Immediately after this, a. meeting-house was erected, and prepared for occupancy early in the year 1745. On the 12th of April, 1753, eleven years subsequent to the organization of the parish, and eight years after the erection of a meeting-house, the second precinct in the town of Groton was incorporated into a separate district by the name of Pepperell, with all the powers and immunities of towns, except the right of sending a representative to the general court. From this period, the territory with its inhabitants, which had been pre viously called the second precinct in the town of Groton, or Groton West Parish, having a character and organization exclusively parochial, became a municipal corporation, also uniting in one body corporate the powers and privileges of towns and parishes. Prior to this union, however, it appears that on the 20th of November, 1746, Thomas Tarbell conveyed to William Farnsworth forty-three and one fourth acres of land in Groton, by deed, in which there is this clause : " always excepting and reserving two acres to be taken out in a regular form, where the meeting-house now stands, in the west parish in said town, as the said Tarbell shall order." No

deed of these two acres from Tarbell or any other person, can be found, nor is there any record thereof; but the language of the reservation seems quite significant.  It indicates very clearly an intention to set apart the small tract thus excepted out of the grant, to some special purpose.  Its location in the immediate vicinity of the meeting-house, the regularity of its form, and the well known practice at that early period, in the various towns in this commonwealth, of reserving pieces of land of similar situation for certain parochial or public uses, tend strongly to the inference that the land thus reserved was intended for like purposes.  That this intention was carried into effect is manifest from the fact that the original common and burying-ground in the vicinity of the meeting-house in the first parish, correspond in size, shape and situation, with the tract reserved in said deed, and that there is no other piece of land in that vicinity, where a similar correspondence can be found.

We are then brought directly to the inquiry concerning the title to this piece of land, which was thus early appropriated to certain public uses.  As there is no deed of the premises to be found, either to the town or parish, we are necessarily driven to the presumption of a grant to one of them arising from long continued possession and use.  The evidence of possession and enjoyment, subsequent to the incorporation of the district in 1753, whereby the parish and town became one body corporate, possessed of parochial and municipal powers, can furnish no aid in determining whether the title was in one or the other.  The possession being concurrent, and equally according to the title, whether vested in the town or parish, affords no presumption of grant in favor of either, considered as two separate and distinct bodies.  We must therefore look to the period preceding the establishment of the district as a municipality, to see whether there is evidence of possession in the parish from which a presumption of title can be raised. The rule is well settled that where a grant is to be inferred from long continued possession of property, the presumption is that the grant was made at the earliest time to which the proof carries back that possession.  The reason for this is

obvious. Possession, in the absence of proof of a higher nature, being evidence of title, is always presumed to have been in accordance therewith. There being in this case no direct and positive proof of grant, and it being necessary to resort to evidence from which such grant may be properly presumed, if it appears that the parish were in possession of the premises, exercising acts of ownership, before the incorporation of the district, then, upon the principle already stated, the presumption would be that the grant was originally to the parish, and passed, upon the incorporation of the district, to one united corporation of town and parish.

Upon reference to that portion of the evidence in the case which relates to the period which intervened between the setting off of the west parish in Groton, in 1742, and the incorporation of the district of Pepperell, in 1753, being an interval of eleven years, it will be found that there are facts and circumstances to warrant the inference of a possession by the parish of the premises in controversy. We start with the fact of the erection of a meeting-house, upon land of which there is no deed to the parish. This shows quite conclusively that the parish had acquired a title to some land there as early as 1746. It is certainly evidence sufficient to raise a presumption of a grant of the land on which the house was erected, and of the usual and necessary approaches and appurtenances thereto. Then we have the fact, already alluded to in another connection, of the reservation in Tarbell's deed in 1746, more than six years prior to the incorporation of the district, of land in the immediate vicinity of the meeting-house, apparently designed for the use to which it was subsequently appropriated. That the two acres were thus set apart, not only before the incorporation of the district, but, so far as the evidence shows, before the establishment of any new district there was contemplated, and that this was done about the time of the erection of the meeting-house, and in immediate connection therewith, *primâ facie* indicates that they were originally designed for parish purposes. But the most decisive evidence on this point is found in two votes of the district, one passed at the first meeting of the district after its incorporation, viz :

in May, 1753, and the other passed in March, 1755. By these it distinctly appears that in March, 1753, the parish, then acting solely as such, passed certain votes " concerning the burying place," and providing for the erection of fences to enclose it. These votes of the district are strong evidence of two important facts; first, that a piece of land had been, prior to the incorporation of the district, set apart and appropriated for public uses, and secondly, that the parish were then in possession thereof, exercising acts of ownership. As the common and burying-place undoubtedly had their origin from the same source of title, it would seem to follow, that the earlier possession of the entire tract was in the parish, and therefore the presumption of grant, founded on possession, is carried back to a period prior to the incorporation of the district, and leads to the inference that it must have been made to the parish.

This result will enable us to arrive at a ready solution of the respective rights of the town and parish to the premises in controversy, and to determine the questions presented by the parties to this suit. The principles of law applicable to property of this description, originally granted to a parish or town, and held by them in their capacity of a united corporation of town and parish, have so often been the subject of judicial consideration and determination in this commonwealth, as to render any examination or statement of them in detail unnecessary. It may now be taken as well-settled law here, that property granted originally to a parish, would, upon the incorporation of the parish into a town, pass to and be held by the new corporation. It would then so remain, until by the creation of a new parish in the town, it became separated into two distinct corporations, having diverse and independent powers. The property would then revert to the parish, to which it was originally granted, unless in the mean time it had been appropriated, as it might well be, to the use of the town in its municipal capacity, by a vote or other act of the one united corporation. The mere use of the land by the town for occasional and temporary purposes, whilst it remained vested in one corporation, would confer no absolute

Lakin *v.* Ames & another.

right or title to it upon the town after the separation; nor could any claim of right, by way of adverse use and possession, arise in favor of the town, whilst the two bodies were united. So long as they continued blended together, it was impossible for one to gain any rights adversely to the other. But it was competent for the corporation, while exercising the functions both of a town and parish, to determine how property belonging to it should be appropriated and used. Although the land in controversy in the present case was originally granted to the parish, there is nothing from which it can be inferred that there was any restriction or limitation annexed to its use. The presumption is, that it was a grant in fee. It therefore depended on the will of the corporation in which the title was vested, to appropriate and direct its use, from time to time, as their own views of interest and convenience might require. This right would continue till the two corporations became disunited. Upon the happening of that event, the rights of the two corporations would become fixed, without any power in one to change the rights of the other thereto. An appropriation to a municipal or parochial use during the union, would determine whether it was town or parish property at the time of the formation of a new parish, and the consequent separation of the town and original parish into two distinct corporations. Such appropriation, when distinctly made, would be equivalent to a grant of the property to a specific use. It might be made, as it usually was in such cases, by a vote of the united corporations, which, if in force at the time of the separation, would be decisive of the title to the property so appropriated, or it might be shown by the erection of structures of a permanent character made during the union, and so long continued as to indicate clearly the dedication of the land to some particular purpose. If, for instance, a town-house, a school-house, or a gun-house, were thus built, it would be an appropriation of the land on which they stood, with that which was appurtenant and necessary for its enjoyment, to the town, because these are manifestly and solely municipal uses, with which a parish has no concern; but the erection of a meeting-house, a vestry, or horse-

sheds near the meeting-house, would be an appropriation of the land, and of so much as might be enclosed and connected with the buildings, or if left open, reasonably incident, from necessity or convenience, to purposes exclusively parochial. When, therefore, the new parish was incorporated, in the town of Pepperell, in 1831, the residue of the parish not included in the new corporation, became successors of the town in all its parochial rights, powers and estate, and also successors of the original parish to which the town succeeded, upon its incorporation in 1753. It follows that it thus became entitled to all property appropriated to parish uses, and to all the original property of the old parish not previously appropriated and devoted to municipal purposes by the united corporation; and that all property which had been, before that time, devoted to town uses, either by express vote, or permanent erection and long continued use, had thereby ceased to be the property of the parish, and become vested in the town. *Medford* v. *Pratt,* 4 Pick. 222; *Milton* v. *Milton,* 10 Pick. 447; *Shrewsbury* v. *Smith,* 14 Pick. 297; *Medford* v. *Medford,* 21 Pick. 199.

The evidence in the present case shows that, from the earliest period, a portion of the land forming part of the common was appropriated for a burying-ground; and that the use of it for this purpose continued during the entire period of the union of the town and parish as one corporation, and since their separation, to the present time. This appropriation was made by various votes of the town, providing for its enclosure, by the erection of tombs therein from time to time, under the authority from the town and its officers, and by the use of it for a long series of years for this distinct purpose. Although in early times the establishment, care, and control of burial-grounds, like the support of schools, might have been partly a parochial and partly a municipal duty, yet before the erection of a new parish in the town of Pepperell, in 1831, they were regarded as appertaining rather to towns than to parishes. As towns and parishes had become separated throughout the commonwealth, by the incorporation of new parishes therein, the charge of burial-grounds had almost uniformly devolved

on towns. The statute of 1814, *c.* 175, had placed them in some measure under the control of the selectmen and the boards of health of towns, as being matters of municipal concern, and the enactment of Rev. Sts. *c.* 15, § 12, shows that in 1836, they were deemed to be among the leading purposes for which towns were expressly authorized to raise money. That the burial-ground in question was regarded by the first parish in Pepperell, as well as by the town, as belonging to the town, and subject to its exclusive care and control, is manifest from the evidence in this case, which shows that after the separation in 1831, the parish exercised no charge over it whatever, but that the care of it was expressly assumed by the town, by a formal vote, and the town has since repaired its fences, enlarged its dimensions, and regulated its use. Under such circumstances and after so long an acquiescence, it seems to us that there can be no doubt of its appropriation to a municipal purpose, and of the right of the town thereto. We are therefore of the opinion that the property in the burying-ground, at the time of the separation, as it was then enclosed and used, together with a convenient right of access to it over parts of the ground called the common, as then appropriated and used for that purpose, must be regarded as having been irrevocably devoted to a municipal purpose, and thereby to have become vested in the town. If this be so, then it follows that the defendants, having acted under the authority and express license of the town, and for the purpose of removing an obstruction to a proper access to a part of the burying-ground as it had been used before, and at the time of the separation, were guilty of no trespass, and are not liable in this action.

But there is another view of the case, leading to the same result, equally satisfactory and decisive. The vote of May 7, 1810, by which Jonas S. Varnum and others had liberty to build two or more tombs in the graveyard, under the direction of the selectmen, and the erection of said tombs, in pursuance of such directions, operated as a valid grant by vote, to erect and use a tomb by said Varnum, with a right of access thereto, as the same was then constructed and subsequently used

*Damon* v. *Granby*, 2 Pick. 345, 351. It would be absurd and contrary to all rules of construction, to hold that this was a grant of a mere right to build a tomb, without the necessary right appurtenant thereto, of access to it over the common, and of entering it in the mode provided under the authority and direction of the agents of the town. That the tomb was so built, with its only opening on the common, and so remained from 1810 to the separation in 1831, estops the parish as successors of the town, to aver that the tomb was not built in conformity with the grant.

By virtue therefore of this grant, and a possession under it of upwards of twenty years prior to the separation of the town and parish, the right to the use of the tomb, and to have access to it on all proper occasion, in the mode in which the entrance thereto was originally constructed, became vested in said Varnum and his heirs, by a title derived directly from the united corporation, comprehending the parish as well as the town.

There can be no doubt, therefore, of the right of the mother of the defendant, Ames, or of any person acting under a license or authority from her, to enter the tomb for the purpose of placing there the body of her deceased son, and to remove all obstructions which would prevent or hinder the rites of sepulture from being there performed in a decent and becoming manner. The learned counsel for the plaintiff, in their argument, have not denied the right of the mother to enter and use the tomb, under this grant, but have put this part of their case mainly upon the want of authority on the part of the defendants to act in the mother's behalf. But there are cases, and this seems to us to be one of them, where the law will imply a license, in the absence of any proof of direct authority, from the necessities of individuals and from the usages of the community. Thus it has been held that the entry upon another's close, or into his house, at usual and reasonable hours, and in a customary manner, for any of the common purposes of life, cannot be regarded as a trespass. In like manner and for a like reason, there are cases where the law will imply that money was paid at the request of a

party, although the payment was made without the knowledge or assent of the party charged therewith. Upon this principle, it has been held, that where a husband has gone abroad leaving his wife, who died in his absence, a third person who voluntarily pays the expenses of her funeral, suitably to the rank and fortunes of the husband, though without his assent, may recover of him the money so paid. 2 Saunders Pl. & Ev. (2d edit.) 410 ; T. Raym. 260 ; *Jenkins* v. *Tucker*, 1 H. Black. 30 ; *Rogers* v. *Price*, 3 Younge & Jervis, 28. A learned judge has said in a case of this character, and in language which is peculiarly applicable to the case at bar, that " the common principles of decency and humanity, the common impulses of our nature, would direct every one, as a preliminary step, to provide a decent funeral, and to do that which was immediately necessary upon the subject." If such be the rule as applicable to transactions of this nature between strangers, it applies with double force where the relation between the parties is such as is shown to have existed in this case. It cannot be that it is necessary to produce formal proof of authority from a mother to a son to do all that was necessary and proper for the burial of her deceased son in the family tomb. The law will imply a license from the nature and exigencies of the case, the relation of the parties, and the well-established usages of a civilized and christian community.

*Judgment for the defendants.*