(Slip Opinion)	OCTOBER TERM, 2012	1

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## FLORIDA *v.* JARDINES

### CERTIORARI TO THE SUPREME COURT OF FLORIDA

No. 11–564.  Argued October 31, 2012—Decided March 26, 2013

Police took a drug-sniffing dog to Jardines' front porch, where the dog gave a positive alert for narcotics.  Based on the alert, the officers obtained a warrant for a search, which revealed marijuana plants; Jardines was charged with trafficking in cannabis.  The Supreme Court of Florida approved the trial court's decision to suppress the evidence, holding that the officers had engaged in a Fourth Amendment search unsupported by probable cause.

*Held*: The investigation of Jardines' home was a "search" within the meaning of the Fourth Amendment.  Pp. 3–10.

   (a) When "the Government obtains information by physically intruding" on persons, houses, papers, or effects, "a 'search' within the original meaning of the Fourth Amendment" has "undoubtedly occurred."  *United States* v. *Jones*, 565 U. S. ___, ___, n. 3.  Pp. 3–4.

   (b) At the Fourth Amendment's "very core" stands "the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion."  *Silverman* v. *United States*, 365 U. S. 505, 511.  The area "immediately surrounding and associated with the home"—the curtilage—is "part of the home itself for Fourth Amendment purposes."  *Oliver* v. *United States*, 466 U. S. 170, 180. The officers entered the curtilage here: The front porch is the classic exemplar of an area "to which the activity of home life extends."  *Id.*, at 182, n. 12.  Pp. 4–5.

   (c) The officers' entry was not explicitly or implicitly invited.  Officers need not "shield their eyes" when passing by a home "on public thoroughfares," *California* v. *Ciraolo*, 476 U. S. 207, 213, but "no man can set his foot upon his neighbour's close without his leave," *Entick* v. *Carrington*, 2 Wils. K. B. 275, 291, 95 Eng. Rep. 807, 817.  A police officer not armed with a warrant may approach a home in hopes of speaking to its occupants, because that is "no more than any private

citizen might do." *Kentucky* v. *King*, 563 U. S. ___, ___.  But the scope
of a license is limited not only to a particular area but also to a specif-
ic purpose, and there is no customary invitation to enter the curtilage
simply to conduct a search.  Pp. 5–8.

   (d) It is unnecessary to decide whether the officers violated
Jardines' expectation of privacy under *Katz* v. *United States*, 389
U. S. 347.  Pp. 8–10.

73 So. 3d 34, affirmed.


   SCALIA, J., delivered the opinion of the Court, in which THOMAS,
GINSBURG, SOTOMAYOR, and KAGAN, JJ., joined.  KAGAN, J., filed a con-
curring opinion, in which GINSBURG and SOTOMAYOR, JJ., joined.  ALITO,
J., filed a dissenting opinion, in which ROBERTS, C. J., and KENNEDY
and BREYER, JJ., joined.

NOTICE: This opinion is subject to formal revision before publication in the
preliminary print of the United States Reports. Readers are requested to
notify the Reporter of Decisions, Supreme Court of the United States, Wash-
ington, D. C. 20543, of any typographical or other formal errors, in order
that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

No. 11–564

FLORIDA, PETITIONER *v.* JOELIS JARDINES

ON WRIT OF CERTIORARI TO THE SUPREME COURT OF
FLORIDA

[March 26, 2013]

JUSTICE SCALIA delivered the opinion of the Court.

We consider whether using a drug-sniffing dog on a homeowner's porch to investigate the contents of the home is a "search" within the meaning of the Fourth Amendment.

## I

In 2006, Detective William Pedraja of the Miami-Dade Police Department received an unverified tip that marijuana was being grown in the home of respondent Joelis Jardines. One month later, the Department and the Drug Enforcement Administration sent a joint surveillance team to Jardines' home. Detective Pedraja was part of that team. He watched the home for fifteen minutes and saw no vehicles in the driveway or activity around the home, and could not see inside because the blinds were drawn. Detective Pedraja then approached Jardines' home accompanied by Detective Douglas Bartelt, a trained canine handler who had just arrived at the scene with his drug-sniffing dog. The dog was trained to detect the scent of marijuana, cocaine, heroin, and several other drugs, indicating the presence of any of these substances through particular behavioral changes recognizable by his handler.

Detective Bartelt had the dog on a six-foot leash, owing in part to the dog's "wild" nature, App. to Pet. for Cert. A–35, and tendency to dart around erratically while search- ing. As the dog approached Jardines' front porch, he apparently sensed one of the odors he had been trained to detect, and began energetically exploring the area for the strongest point source of that odor. As Detective Bartelt explained, the dog "began tracking that airborne odor by . . . tracking back and forth," engaging in what is called "bracketing," "back and forth, back and forth." *Id.,* at A– 33 to A–34. Detective Bartelt gave the dog "the full six feet of the leash plus whatever safe distance [he could] give him" to do this—he testified that he needed to give the dog "as much distance as I can." *Id.,* at A–35. And Detective Pedraja stood back while this was occurring, so that he would not "get knocked over" when the dog was "spinning around trying to find" the source. *Id.,* at A–38.

After sniffing the base of the front door, the dog sat, which is the trained behavior upon discovering the odor's strongest point. Detective Bartelt then pulled the dog away from the door and returned to his vehicle. He left the scene after informing Detective Pedraja that there had been a positive alert for narcotics.

On the basis of what he had learned at the home, De- tective Pedraja applied for and received a warrant to search the residence. When the warrant was executed later that day, Jardines attempted to flee and was arrested; the search revealed marijuana plants, and he was charged with trafficking in cannabis.

At trial, Jardines moved to suppress the marijuana plants on the ground that the canine investigation was an unreasonable search. The trial court granted the motion, and the Florida Third District Court of Appeal reversed. On a petition for discretionary review, the Florida Su- preme Court quashed the decision of the Third District Court of Appeal and approved the trial court's decision to

suppress, holding (as relevant here) that the use of the trained narcotics dog to investigate Jardines' home was a Fourth Amendment search unsupported by probable cause, rendering invalid the warrant based upon information gathered in that search. 73 So. 3d 34 (2011).

We granted certiorari, limited to the question of whether the officers' behavior was a search within the meaning of the Fourth Amendment. 565 U. S. ___ (2012).

## II

The Fourth Amendment provides in relevant part that the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." The Amendment establishes a simple baseline, one that for much of our history formed the exclusive basis for its protections: When "the Government obtains information by physically intruding" on persons, houses, papers, or effects, "a 'search' within the original meaning of the Fourth Amendment" has "undoubtedly occurred." *United States* v. *Jones*, 565 U. S. ___, ___, n. 3 (2012) (slip op., at 6, n. 3). By reason of our decision in *Katz* v. *United States*, 389 U. S. 347 (1967), property rights "are not the sole measure of Fourth Amendment violations," *Soldal* v. *Cook County*, 506 U. S. 56, 64 (1992)—but though *Katz* may add to the baseline, it does not subtract anything from the Amendment's protections "when the Government *does* engage in [a] physical intrusion of a constitutionally protected area," *United States* v. *Knotts*, 460 U. S. 276, 286 (1983) (Brennan, J., concurring in the judgment).

That principle renders this case a straightforward one. The officers were gathering information in an area belonging to Jardines and immediately surrounding his house—in the curtilage of the house, which we have held enjoys protection as part of the home itself. And they gathered that information by physically entering and occupying the

area to engage in conduct not explicitly or implicitly per-
mitted by the homeowner.

## A

The Fourth Amendment "indicates with some precision
the places and things encompassed by its protections":
persons, houses, papers, and effects. *Oliver* v. *United
States*, 466 U. S. 170, 176 (1984). The Fourth Amendment
does not, therefore, prevent all investigations conducted
on private property; for example, an officer may (subject to
*Katz*) gather information in what we have called "open
fields"—even if those fields are privately owned—because
such fields are not enumerated in the Amendment's text.
*Hester* v. *United States*, 265 U. S. 57 (1924).

But when it comes to the Fourth Amendment, the home
is first among equals. At the Amendment's "very core"
stands "the right of a man to retreat into his own home
and there be free from unreasonable governmental in-
trusion." *Silverman* v. *United States*, 365 U. S. 505, 511
(1961). This right would be of little practical value if the
State's agents could stand in a home's porch or side gar-
den and trawl for evidence with impunity; the right to
retreat would be significantly diminished if the police
could enter a man's property to observe his repose from
just outside the front window.

We therefore regard the area "immediately surrounding
and associated with the home"—what our cases call the
curtilage—as "part of the home itself for Fourth Amend-
ment purposes." *Oliver*, *supra,* at 180. That principle has
ancient and durable roots. Just as the distinction between
the home and the open fields is "as old as the common
law," *Hester*, *supra,* at 59, so too is the identity of home
and what Blackstone called the "curtilage or homestall,"
for the "house protects and privileges all its branches and
appurtenants." 4 W. Blackstone, Commentaries on the
Laws of England 223, 225 (1769). This area around the

home is "intimately linked to the home, both physically and psychologically," and is where "privacy expectations are most heightened." *California* v. *Ciraolo*, 476 U. S. 207, 213 (1986).

While the boundaries of the curtilage are generally "clearly marked," the "conception defining the curtilage" is at any rate familiar enough that it is "easily understood from our daily experience." *Oliver*, 466 U. S., at 182, n. 12. Here there is no doubt that the officers entered it: The front porch is the classic exemplar of an area adjacent to the home and "to which the activity of home life extends." *Ibid.*

## B

Since the officers' investigation took place in a constitutionally protected area, we turn to the question of whether it was accomplished through an unlicensed physical intrusion.[1] While law enforcement officers need not "shield their eyes" when passing by the home "on public thoroughfares," *Ciraolo*, 476 U. S., at 213, an officer's leave to gather information is sharply circumscribed when he steps off those thoroughfares and enters the Fourth Amendment's protected areas. In permitting, for example, visual observation of the home from "public navigable airspace," we were careful to note that it was done "in a physically nonintrusive manner." *Ibid. Entick* v. *Carrington*, 2 Wils. K. B. 275, 95 Eng. Rep. 807 (K. B. 1765), a case "undoubtedly familiar" to "every American statesman" at the time of the Founding, *Boyd* v. *United States*, 116 U. S. 616, 626

---

[1] At oral argument, the State and its *amicus* the Solicitor General argued that Jardines conceded in the lower courts that the officers had a right to be where they were. This misstates the record. Jardines conceded nothing more than the unsurprising proposition that the officers could have lawfully approached his home to knock on the front door in hopes of speaking with him. Of course, that is not what they did.

(1886), states the general rule clearly: "[O]ur law holds the property of every man so sacred, that no man can set his foot upon his neighbour's close without his leave." 2 Wils. K. B., at 291, 95 Eng. Rep., at 817. As it is undisputed that the detectives had all four of their feet and all four of their companion's firmly planted on the constitutionally protected extension of Jardines' home, the only question is whether he had given his leave (even implicitly) for them to do so. He had not.

"A license may be implied from the habits of the country," notwithstanding the "strict rule of the English common law as to entry upon a close." *McKee* v. *Gratz*, 260 U. S. 127, 136 (1922) (Holmes, J.). We have accordingly recognized that "the knocker on the front door is treated as an invitation or license to attempt an entry, justifying ingress to the home by solicitors, hawkers and peddlers of all kinds." *Breard* v. *Alexandria*, 341 U. S. 622, 626 (1951). This implicit license typically permits the visitor to approach the home by the front path, knock promptly, wait briefly to be received, and then (absent invitation to linger longer) leave. Complying with the terms of that traditional invitation does not require fine-grained legal knowledge; it is generally managed without incident by the Nation's Girl Scouts and trick-or-treaters.[2] Thus, a police officer not armed with a warrant may approach a home and knock, precisely because that is "no more than any private citizen might do." *Kentucky* v. *King*, 563 U. S.

———————
[2] With this much, the dissent seems to agree—it would inquire into "'the appearance of things,'" *post,* at 5 (opinion of ALITO, J.), what is "typica[l]" for a visitor, *ibid.*, what might cause "alarm" to a "resident of the premises," *ibid.*, what is "expected" of "ordinary visitors," *ibid.*, and what would be expected from a "'reasonably respectful citizen,'" *post,* at 7. These are good questions. But their answers are incompatible with the dissent's outcome, which is presumably why the dissent does not even try to argue that it would be customary, usual, reasonable, respectful, ordinary, typical, nonalarming, etc., for a stranger to explore the curtilage of the home with trained drug dogs.

\_\_\_, \_\_\_ (2011) (slip op., at 16).

But introducing a trained police dog to explore the area around the home in hopes of discovering incriminating evidence is something else. There is no customary invitation to do *that*. An invitation to engage in canine forensic investigation assuredly does not inhere in the very act of hanging a knocker.[3] To find a visitor knocking on the door is routine (even if sometimes unwelcome); to spot that same visitor exploring the front path with a metal detector, or marching his bloodhound into the garden before saying hello and asking permission, would inspire most of us to—well, call the police. The scope of a license—express or implied—is limited not only to a particular area but also to a specific purpose. Consent at a traffic stop to an officer's checking out an anonymous tip that there is a body in the trunk does not permit the officer to rummage through the trunk for narcotics. Here, the background social norms that invite a visitor to the front door do not invite him there to conduct a search.[4]

_____

[3] The dissent insists that our argument must rest upon "the particular instrument that Detective Bartelt used to detect the odor of marijuana"—the dog. *Post,* at 8. It is not the dog that is the problem, but the behavior that here involved use of the dog. We think a typical person would find it "'a cause for great alarm'" (the kind of reaction the dissent quite rightly relies upon to justify its no-night-visits rule, *post,* at 5) to find a stranger snooping about his front porch *with or without* a dog. The dissent would let the police do whatever they want by way of gathering evidence so long as they stay on the base-path, to use a baseball analogy—so long as they "stick to the path that is typically used to approach a front door, such as a paved walkway." *Ibid.* From that vantage point they can presumably peer into the house through binoculars with impunity. That is not the law, as even the State concedes. See Tr. of Oral Arg. 6.

[4] The dissent argues, citing *King*, that "gathering evidence—even damning evidence—is a lawful activity that falls within the scope of the license to approach." *Post,* at 7. That is a false generalization. What *King* establishes is that it is not a Fourth Amendment search to approach the home in order to speak with the occupant, *because all are*

The State points to our decisions holding that the subjective intent of the officer is irrelevant. See *Ashcroft* v. *al-Kidd*, 563 U. S. ___ (2011); *Whren* v. *United States*, 517 U. S. 806 (1996). But those cases merely hold that a stop or search *that is objectively reasonable* is not vitiated by the fact that the officer's real reason for making the stop or search has nothing to do with the validating reason. Thus, the defendant will not be heard to complain that although he was speeding the officer's real reason for the stop was racial harassment. See *id.,* at 810, 813. Here, however, the question before the court is precisely *whether* the officer's conduct was an objectively reasonable search. As we have described, that depends upon whether the officers had an implied license to enter the porch, which in turn depends upon the purpose for which they entered. Here, their behavior objectively reveals a purpose to conduct a search, which is not what anyone would think he had license to do.

## III

The State argues that investigation by a forensic narcotics dog by definition cannot implicate any legitimate privacy interest. The State cites for authority our decisions in *United States* v. *Place*, 462 U. S. 696 (1983), *United States* v. *Jacobsen*, 466 U. S. 109 (1984), and *Illinois* v. *Caballes*, 543 U. S. 405 (2005), which held, respectively, that canine inspection of luggage in an airport, chemical testing of a substance that had fallen from a parcel in transit, and canine inspection of an automobile during a lawful traffic stop, do not violate the "reasonable expectation of privacy" described in *Katz*.

---

*invited to do that*. The mere "purpose of discovering information," *post*, at 8, in the course of engaging in that permitted conduct does not cause it to violate the Fourth Amendment. But no one is impliedly invited to enter the protected premises of the home in order to do nothing but conduct a search.

Just last Term, we considered an argument much like this. *Jones* held that tracking an automobile's whereabouts using a physically-mounted GPS receiver is a Fourth Amendment search. The Government argued that the *Katz* standard "show[ed] that no search occurred," as the defendant had "no 'reasonable expectation of privacy'" in his whereabouts on the public roads, *Jones*, 565 U. S., at ___ (slip op., at 5)—a proposition with at least as much support in our case law as the one the State marshals here. See, *e.g., United States* v. *Knotts*, 460 U. S. 276, 278 (1983). But because the GPS receiver had been physically mounted on the defendant's automobile (thus intruding on his "effects"), we held that tracking the vehicle's movements was a search: a person's "Fourth Amendment rights do not rise or fall with the *Katz* formulation." *Jones*, *supra,* at ___ (slip op., at 5). The *Katz* reasonable-expectations test "has been *added to*, not *substituted for*," the traditional property-based understanding of the Fourth Amendment, and so is unnecessary to consider when the government gains evidence by physically intruding on constitutionally protected areas. *Jones*, *supra*, at ___ (slip op., at 8).

Thus, we need not decide whether the officers' investigation of Jardines' home violated his expectation of privacy under *Katz*. One virtue of the Fourth Amendment's property-rights baseline is that it keeps easy cases easy. That the officers learned what they learned only by physically intruding on Jardines' property to gather evidence is enough to establish that a search occurred.

For a related reason we find irrelevant the State's argument (echoed by the dissent) that forensic dogs have been commonly used by police for centuries. This argument is apparently directed to our holding in *Kyllo* v. *United States*, 533 U. S. 27 (2001), that surveillance of the home is a search where "the Government uses a device that is not in general public use" to "explore details of the

home that would previously have been unknowable *without physical intrusion.*" *Id.*, at 40 (emphasis added). But the implication of that statement (*inclusio unius est exclusio alterius*) is that when the government uses a physical intrusion to explore details of the home (including its curtilage), the antiquity of the tools that they bring along is irrelevant.

\*　\*　\*

The government's use of trained police dogs to investigate the home and its immediate surroundings is a "search" within the meaning of the Fourth Amendment. The judgment of the Supreme Court of Florida is therefore affirmed.

*It is so ordered.*

# SUPREME COURT OF THE UNITED STATES

———————

No. 11–564

———————

## FLORIDA, PETITIONER *v.* JOELIS JARDINES

ON WRIT OF CERTIORARI TO THE SUPREME COURT OF FLORIDA

[March 26, 2013]

JUSTICE KAGAN, with whom JUSTICE GINSBURG and JUSTICE SOTOMAYOR join, concurring.

For me, a simple analogy clinches this case—and does so on privacy as well as property grounds. A stranger comes to the front door of your home carrying super-high-powered binoculars. See *ante*, at 7, n. 3. He doesn't knock or say hello. Instead, he stands on the porch and uses the binoculars to peer through your windows, into your home's furthest corners. It doesn't take long (the binoculars are really very fine): In just a couple of minutes, his uncommon behavior allows him to learn details of your life you disclose to no one. Has your "visitor" trespassed on your property, exceeding the license you have granted to members of the public to, say, drop off the mail or distribute campaign flyers? Yes, he has. And has he also invaded your "reasonable expectation of privacy," by nosing into intimacies you sensibly thought protected from disclosure? *Katz* v. *United States*, 389 U. S. 347, 360 (1967) (Harlan, J., concurring). Yes, of course, he has done that too.

That case is this case in every way that matters. Here, police officers came to Joelis Jardines' door with a super-sensitive instrument, which they deployed to detect things inside that they could not perceive unassisted. The equipment they used was animal, not mineral. But contra the dissent, see *post*, at 2 (opinion of ALITO, J.) (noting the ubiquity of dogs in American households), that is of no

significance in determining whether a search occurred. Detective Bartelt's dog was not your neighbor's pet, come to your porch on a leisurely stroll. As this Court discussed earlier this Term, drug-detection dogs are highly trained tools of law enforcement, geared to respond in distinctive ways to specific scents so as to convey clear and reliable information to their human partners. See *Florida* v. *Harris*, 568 U. S. ___ (2013) (slip op. at 2–3, 7–8). They are to the poodle down the street as high-powered binoculars are to a piece of plain glass. Like the binoculars, a drug-detection dog is a specialized device for discovering objects not in plain view (or plain smell). And as in the hypothetical above, that device was aimed here at a home—the most private and inviolate (or so we expect) of all the places and things the Fourth Amendment protects. Was this activity a trespass? Yes, as the Court holds today. Was it also an invasion of privacy? Yes, that as well.

The Court today treats this case under a property rubric; I write separately to note that I could just as happily have decided it by looking to Jardines' privacy interests. A decision along those lines would have looked . . . well, much like this one. It would have talked about "'the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion.'" *Ante*, at 4 (quoting *Silverman* v. *United States*, 365 U. S. 505, 511 (1961)). It would have insisted on maintaining the "practical value" of that right by preventing police officers from standing in an adjacent space and "trawl[ing] for evidence with impunity." *Ante*, at 4. It would have explained that "'privacy expectations are most heightened'" in the home and the surrounding area. *Ante*, at 4–5 (quoting *California* v. *Ciraolo*, 476 U. S. 207, 213 (1986)). And it would have determined that police officers invade those shared expectations when they use trained canine assistants to reveal within the confines of a home what they could not otherwise have found there. See *ante*, at 6–7, and nn. 2–3.

It is not surprising that in a case involving a search of a home, property concepts and privacy concepts should so align. The law of property "naturally enough influence[s]" our "shared social expectations" of what places should be free from governmental incursions. *Georgia* v. *Randolph*, 547 U. S. 103, 111 (2006); see *Rakas* v. *Illinois*, 439 U. S. 128, 143, n. 12 (1978). And so the sentiment "my home is my own," while originating in property law, now also denotes a common understanding—extending even beyond that law's formal protections—about an especially private sphere. Jardines' home was his property; it was also his most intimate and familiar space. The analysis proceeding from each of those facts, as today's decision reveals, runs mostly along the same path.

I can think of only one divergence: If we had decided this case on privacy grounds, we would have realized that *Kyllo* v. *United States*, 533 U. S. 27 (2001), already resolved it.[1] The *Kyllo* Court held that police officers conducted a search when they used a thermal-imaging device to detect heat emanating from a private home, even though they committed no trespass. Highlighting our intention to draw both a "firm" and a "bright" line at "the entrance to the house," *id.*, at 40, we announced the following rule:

> "Where, as here, the Government uses a device that is not in general public use, to explore details of the home that would previously have been unknowable

_____

[1] The dissent claims, alternatively, that *Illinois* v. *Caballes*, 543 U. S. 405, 409–410 (2005), controls this case (or nearly does). See *post*, at 9, 11. But *Caballes* concerned a drug-detection dog's sniff of an automobile during a traffic stop. See also *Florida* v. *Harris*, 568 U. S. ___ (2013). And we have held, over and over again, that people's expectations of privacy are much lower in their cars than in their homes. See, *e.g., Arizona* v. *Gant*, 556 U. S. 332, 345 (2009); *Wyoming* v. *Houghton*, 526 U. S. 295, 303 (1999); *New York* v. *Class*, 475 U. S. 106, 115 (1986); *Cardwell* v. *Lewis*, 417 U. S. 583, 590–591 (1974) (plurality opinion).

without physical intrusion, the surveillance is a 'search' and is presumptively unreasonable without a warrant." *Ibid.*

That "firm" and "bright" rule governs this case: The police officers here conducted a search because they used a "device . . . not in general public use" (a trained drug-detection dog) to "explore details of the home" (the presence of certain substances) that they would not otherwise have discovered without entering the premises.

And again, the dissent's argument that the device is just a dog cannot change the equation. As *Kyllo* made clear, the "sense-enhancing" tool at issue may be "crude" or "sophisticated," may be old or new (drug-detection dogs actually go back not "12,000 years" or "centuries," *post*, at 2, 8, 12, but only a few decades), may be either smaller or bigger than a breadbox; still, "at least where (as here)" the device is not "in general public use," training it on a home violates our "minimal expectation of privacy"—an expectation "that *exists*, and that is acknowledged to be *reasonable*." 533 U. S., at 34, 36.[2] That does not mean the device

_____

[2]The dissent's other principal reason for concluding that no violation of privacy occurred in this case—that police officers themselves might detect an aroma wafting from a house—works no better. If officers can smell drugs coming from a house, they can use that information; a human sniff is not a search, we can all agree. But it does not follow that a person loses his expectation of privacy in the many scents within his home that (his own nose capably tells him) are not usually detectible by humans standing outside. And indeed, *Kyllo* already decided as much. In response to an identical argument from the dissent in that case, see 533 U. S., at 43 (Stevens, J., dissenting) (noting that humans can sometimes detect "heat emanating from a building"), the *Kyllo* Court stated: "The dissent's comparison of the thermal imaging to various circumstances in which outside observers might be able to perceive, without technology, the heat of the home . . . is quite irrelevant. The fact that equivalent information could sometimes be obtained by other means does not make lawful the use of means that violate the Fourth Amendment. . . . In any event, [at the time in question,] no outside observer could have discerned the relative heat of

is off-limits, as the dissent implies, see *post*, at 11–12; it just means police officers cannot use it to examine a home without a warrant or exigent circumstance.  See *Brigham City* v. *Stuart*, 547 U. S. 398, 403–404 (2006) (describing exigencies allowing the warrantless search of a home).

   With these further thoughts, suggesting that a focus on Jardines' privacy interests would make an "easy cas[e] easy" twice over, *ante*, at 9, I join the Court's opinion in full.

————

Kyllo's home without thermal imaging." *Id.,* at 35, n. 2.

# SUPREME COURT OF THE UNITED STATES

———————

No. 11–564

———————

## FLORIDA, PETITIONER *v.* JOELIS JARDINES

ON WRIT OF CERTIORARI TO THE SUPREME COURT OF
FLORIDA

[March 26, 2013]

JUSTICE ALITO, with whom THE CHIEF JUSTICE, JUS-
TICE KENNEDY, and JUSTICE BREYER join, dissenting.

The Court's decision in this important Fourth Amend-
ment case is based on a putative rule of trespass law that
is nowhere to be found in the annals of Anglo-American
jurisprudence.

The law of trespass generally gives members of the
public a license to use a walkway to approach the front
door of a house and to remain there for a brief time. This
license is not limited to persons who intend to speak to an
occupant or who actually do so. (Mail carriers and persons
delivering packages and flyers are examples of individuals
who may lawfully approach a front door without intending
to converse.) Nor is the license restricted to categories
of visitors whom an occupant of the dwelling is likely to
welcome; as the Court acknowledges, this license applies
even to "solicitors, hawkers and peddlers of all kinds."
*Ante*, at 6 (internal quotation marks omitted). And the
license even extends to police officers who wish to gather
evidence against an occupant (by asking potentially in-
criminating questions).

According to the Court, however, the police officer in
this case, Detective Bartelt, committed a trespass because
he was accompanied during his otherwise lawful visit to
the front door of respondent's house by his dog, Franky.
Where is the authority evidencing such a rule? Dogs have

been domesticated for about 12,000 years;[1] they were ubiquitous in both this country and Britain at the time of the adoption of the Fourth Amendment;[2] and their acute sense of smell has been used in law enforcement for centuries.[3]  Yet the Court has been unable to find a single case—from the United States or any other common-law nation—that supports the rule on which its decision is based.  Thus, trespass law provides no support for the Court's holding today.

The Court's decision is also inconsistent with the reasonable-expectations-of-privacy test that the Court adopted in *Katz* v. *United States*, 389 U. S. 347 (1967).  A reasonable person understands that odors emanating from a house may be detected from locations that are open to the public, and a reasonable person will not count on the strength of those odors remaining within the range that, while detectible by a dog, cannot be smelled by a human.

For these reasons, I would hold that no search within the meaning of the Fourth Amendment took place in this case, and I would reverse the decision below.

I

The opinion of the Court may leave a reader with the mistaken impression that Detective Bartelt and Franky remained on respondent's property for a prolonged period of time and conducted a far-flung exploration of the front yard.  See *ante*, at 4 ("trawl for evidence with impunity"), 7 ("marching his bloodhound into the garden").  But that is not what happened.

Detective Bartelt and Franky approached the front door via the driveway and a paved path—the route that any

---

[1] See, *e.g.,* Sloane, Dogs in War, Police Work and on Patrol, 46 J. Crim. L., C. & P. S. 385 (1955–1956) (hereinafter Sloane).

[2] M. Derr, A Dog's History of America 68–92 (2004); K. Olsen, Daily Life in 18th-Century England 32–33 (1999).

[3] Sloane 388–389.

visitor would customarily use[4]—and Franky was on the kind of leash that any dog owner might employ.[5]   As Franky approached the door, he started to track an airborne odor.  He held his head high and began "bracketing" the area (pacing back and forth) in order to determine the strongest source of the smell.   App. 95–96.   Detective Bartelt knew "the minute [he] observed" this behavior that Franky had detected drugs.  *Id.*, at 95.  Upon locating the odor's strongest source, Franky sat at the base of the front door, and at this point, Detective Bartelt and Franky immediately returned to their patrol car.  *Id.*, at 98.

A critical fact that the Court omits is that, as respondent's counsel explained at oral argument, this entire process—walking down the driveway and front path to the front door, waiting for Franky to find the strongest source of the odor, and walking back to the car—took approximately a minute or two.  Tr. of Oral Arg. 57–58.  Thus, the amount of time that Franky and the detective remained at the front porch was even less.  The Court also fails to mention that, while Detective Bartelt apparently did not personally smell the odor of marijuana coming from the house, another officer who subsequently stood on the front porch, Detective Pedraja, did notice that smell and was able to identify it.  App. 81.

## II

The Court concludes that the conduct in this case was a search because Detective Bartelt exceeded the boundaries of the license to approach the house that is recognized by

_____

[4] See App. 94; App. to Brief for Respondent 1A (depiction of respondent's home).

[5] The Court notes that Franky was on a 6-foot leash, but such a leash is standard equipment for ordinary dog owners.   See, *e.g.,* J. Stregowski, Four Dog Leash Varieties, http://dogs.about.com/od/toyssupplies/tp/Dog-Leashes.htm (all Internet materials as visited Mar. 21, 2013, and available in Clerk of Court's case file).

the law of trespass, but the Court's interpretation of the scope of that license is unfounded.

## A

It is said that members of the public may lawfully proceed along a walkway leading to the front door of a house because custom grants them a license to do so. *Breard* v. *Alexandria*, 341 U. S. 622, 626 (1951); *Lakin* v. *Ames*, 64 Mass. 198, 220 (1852); J. Bishop, Commentaries on the Non-Contract Law §823, p. 378 (1889). This rule encompasses categories of visitors whom most homeowners almost certainly wish to allow to approach their front doors—friends, relatives, mail carriers, persons making deliveries. But it also reaches categories of visitors who are less universally welcome—"solicitors," "hawkers," "peddlers," and the like. The law might attempt to draw fine lines between categories of welcome and unwelcome visitors, distinguishing, for example, between tolerable and intolerable door-to-door peddlers (Girl Scouts selling cookies versus adults selling aluminum siding) or between police officers on agreeable and disagreeable missions (gathering information about a bothersome neighbor versus asking potentially incriminating questions). But the law of trespass has not attempted such a difficult taxonomy. See *Desnick* v. *American Broadcasting Cos.,* 44 F. 3d 1345, 1351 (CA7 1995) ("[C]onsent to an entry is often given legal effect even though the entrant has intentions that if known to the owner of the property would cause him for perfectly understandable and generally ethical or at least lawful reasons to revoke his consent"); cf. *Skinner* v. *Ogallala Public School Dist.*, 262 Neb. 387, 402, 631 N. W. 2d 510, 525 (2001) ("[I]n order to determine if a business invitation is implied, the inquiry is not a subjective assessment of why the visitor chose to visit the premises in a particular instance"); *Crown Cork & Seal Co.* v. *Kane*, 213 Md. 152, 159, 131 A. 2d 470, 473–474

(1957) (noting that "there are many cases in which an invitation has been implied from circumstances, such as custom," and that this test is "objective in that it stresses custom and the appearance of things" as opposed to "the undisclosed intention of the visitor").

Of course, this license has certain spatial and temporal limits. A visitor must stick to the path that is typically used to approach a front door, such as a paved walkway. A visitor cannot traipse through the garden, meander into the backyard, or take other circuitous detours that veer from the pathway that a visitor would customarily use. See, *e.g., Robinson* v. *Virginia*, 47 Va. App. 533, 549–550, 625 S. E. 2d 651, 659 (2006) (en banc); *United States* v. *Wells*, 648 F. 3d 671, 679–680 (CA8 2011) (police exceeded scope of their implied invitation when they bypassed the front door and proceeded directly to the back yard); *State* v. *Harris*, 919 S. W. 2d 619, 624 (Tenn. Crim. App. 1995) ("Any substantial and unreasonable departure from an area where the public is impliedly invited exceeds the scope of the implied invitation . . . " (internal quotation marks and brackets omitted)); 1 W. LaFave, Search and Seizure §2.3(c), p. 578 (2004) (hereinafter LaFave); *id.*, §2.3(f), at 600–603 ("[W]hen the police come on to private property to conduct an investigation or for some other legitimate purpose and restrict their movements to places visitors could be expected to go (e.g., walkways, driveways, porches), observations made from such vantage points are not covered by the Fourth Amendment" (footnotes omitted)).

Nor, as a general matter, may a visitor come to the front door in the middle of the night without an express invitation. See *State* v. *Cada*, 129 Idaho 224, 233, 923 P. 2d 469, 478 (App. 1996) ("Furtive intrusion late at night or in the predawn hours is not conduct that is expected from ordinary visitors. Indeed, if observed by a resident of the premises, it could be a cause for great alarm").

Similarly, a visitor may not linger at the front door for an extended period. See 9 So. 3d 1, 11 (Fla. App. 2008) (case below) (Cope, J., concurring in part and dissenting in part) ("[T]here is no such thing as squatter's rights on a front porch. A stranger may not plop down uninvited to spend the afternoon in the front porch rocking chair, or throw down a sleeping bag to spend the night, or lurk on the front porch, looking in the windows"). The license is limited to the amount of time it would customarily take to approach the door, pause long enough to see if someone is home, and (if not expressly invited to stay longer), leave.

As I understand the law of trespass and the scope of the implied license, a visitor who adheres to these limitations is not necessarily required to ring the doorbell, knock on the door, or attempt to speak with an occupant. For example, mail carriers, persons making deliveries, and individuals distributing flyers may leave the items they are carrying and depart without making any attempt to converse. A pedestrian or motorist looking for a particular address may walk up to a front door in order to check a house number that is hard to see from the sidewalk or road. A neighbor who knows that the residents are away may approach the door to retrieve an accumulation of newspapers that might signal to a potential burglar that the house is unoccupied.

As the majority acknowledges, this implied license to approach the front door extends to the police. See *ante,* at 6. As we recognized in *Kentucky* v. *King*, 563 U. S. ___ (2011), police officers do not engage in a search when they approach the front door of a residence and seek to engage in what is termed a "knock and talk," *i.e.*, knocking on the door and seeking to speak to an occupant for the purpose of gathering evidence. See *id.*, at ___ (slip op., at 16) ("When law enforcement officers who are not armed with a warrant knock on a door, they do no more than any private citizen might do"). See also 1 LaFave §2.3(e), at 592

("It is not objectionable for an officer to come upon that part of the property which has been opened to public common use" (internal quotation marks omitted)).  Even when the objective of a "knock and talk" is to obtain evidence that will lead to the homeowner's arrest and prosecution, the license to approach still applies.  In other words, gathering evidence—even damning evidence—is a lawful activity that falls within the scope of the license to approach.  And when officers walk up to the front door of a house, they are permitted to see, hear, and smell whatever can be detected from a lawful vantage point. *California* v. *Ciraolo*, 476 U. S. 207, 213 (1986) ("The Fourth Amendment protection of the home has never been extended to require law enforcement officers to shield their eyes when passing by a home on public thoroughfares"); *Cada*, *supra,* at 232, 923 P. 2d, at 477 ("[P]olice officers restricting their activity to [areas to which the public is impliedly invited] are permitted the same intrusion and the same level of observation as would be expected from a reasonably respectful citizen" (internal quotation marks omitted)); 1 LaFave §§2.2(a), 2.3(c), at 450–452, 572–577.

B

Detective Bartelt did not exceed the scope of the license to approach respondent's front door.  He adhered to the customary path; he did not approach in the middle of the night; and he remained at the front door for only a very short period (less than a minute or two).

The Court concludes that Detective Bartelt went too far because he had the "*objectiv[e] . . . purpose* to conduct a search." *Ante*, at 8 (emphasis added).  What this means, I take it, is that anyone aware of what Detective Bartelt did would infer that his subjective purpose was to gather evidence.  But if this is the Court's point, then a standard "knock and talk" and most other police visits would likewise constitute searches.  With the exception of visits to

serve warrants or civil process, police almost always approach homes with a purpose of discovering information. That is certainly the objective of a "knock and talk."  The Court offers no meaningful way of distinguishing the "objective purpose" of a "knock and talk" from the "objective purpose" of Detective Bartelt's conduct here.

The Court contends that a "knock and talk" is different because it involves talking, and "all are invited" to do that. *Ante*, at 7–8, n. 4 (emphasis deleted).  But a police officer who approaches the front door of a house in accordance with the limitations already discussed may gather evidence by means other than talking.  The officer may observe items in plain view and smell odors coming from the house.  *Ciraolo, supra,* at 213; *Cada*, 129 Idaho*,* at 232, 923 P. 2d, at 477; 1 LaFave §§2.2(a), 2.3(c), at 450–452, 572–577.  So the Court's "objective purpose" argument cannot stand.

What the Court must fall back on, then, is the particular instrument that Detective Bartelt used to detect the odor of marijuana, namely, his dog.  But in the entire body of common-law decisions, the Court has not found a single case holding that a visitor to the front door of a home commits a trespass if the visitor is accompanied by a dog on a leash.  On the contrary, the common law allowed even unleashed dogs to wander on private property without committing a trespass.  G. Williams, Liability for Animals 136–146 (1939); J. Ingham, A Treatise on Property in Animals Wild and Domestic and the Rights and Responsibilities Arising Therefrom 277–278 (1900).  Cf. B. Markesinis & S. Deakin, Tort Law 511 (4th ed. 1999).

The Court responds that "[i]t is not the dog that is the problem, but the behavior that here involved use of the dog." *Ante,* at 7, n. 3.  But where is the support in the law of trespass for *this* proposition?  Dogs' keen sense of smell has been used in law enforcement for centuries.  The antiquity of this practice is evidenced by a Scottish law

from 1318 that made it a crime to "disturb a tracking dog or the men coming with it for pursuing thieves or seizing malefactors."  K. Brown et al., The Records of the Parliaments of Scotland to 1707, (St Andrews, 2007–2013), online at http://www.rps.ac.uk/mss/1318/9.  If bringing a tracking dog to the front door of a home constituted a trespass, one would expect at least one case to have arisen during the past 800 years.  But the Court has found none.

For these reasons, the real law of trespass provides no support for the Court's holding today.  While the Court claims that its reasoning has "ancient and durable roots," *ante,* at 4, its trespass rule is really a newly struck counterfeit.

## III

The concurring opinion attempts to provide an alternative ground for today's decision, namely, that Detective Bartelt's conduct violated respondent's reasonable expectations of privacy.  But we have already rejected a very similar, if not identical argument, see *Illinois* v. *Caballes*, 543 U. S. 405, 409–410 (2005), and in any event I see no basis for concluding that the occupants of a dwelling have a reasonable expectation of privacy in odors that emanate from the dwelling and reach spots where members of the public may lawfully stand.

It is clear that the occupant of a house has no reasonable expectation of privacy with respect to odors that can be smelled by human beings who are standing in such places.  See *United States* v. *Johns*, 469 U. S. 478, 482 (1985) ("After the officers came closer and detected the distinct odor of marihuana, they had probable cause to believe that the vehicles contained contraband"); *United States* v. *Ventresca*, 380 U. S. 102, 111 (1965) (scent of fermenting mash supported probable cause for warrant); *United States* v. *Johnston*, 497 F. 2d 397, 398 (CA9 1974) (there is no "reasonable expectation of privacy from drug agents

with inquisitive nostrils"). And I would not draw a line between odors that can be smelled by humans and those that are detectible only by dogs.

Consider the situation from the point of view of the occupant of a building in which marijuana is grown or methamphetamine is manufactured. Would such an occupant reason as follows? "I know that odors may emanate from my building and that atmospheric conditions, such as the force and direction of the wind, may affect the strength of those odors when they reach a spot where members of the public may lawfully stand. I also know that some people have a much more acute sense of smell than others,[6] and I have no idea who might be standing in one of the spots in question when the odors from my house reach that location. In addition, I know that odors coming from my building, when they reach these locations, may be strong enough to be detected by a dog. But I am confident that they will be so faint that they cannot be smelled by any human being." Such a finely tuned expectation would be entirely unrealistic, and I see no evidence that society is prepared to recognize it as reasonable.

In an attempt to show that respondent had a reasonable expectation of privacy in the odor of marijuana wafting from his house, the concurrence argues that this case is just like *Kyllo* v. *United States*, 533 U. S. 27 (2001), which held that police officers conducted a search when they used a thermal imaging device to detect heat emanating from a house. *Ante*, at 3–4 (opinion of KAGAN, J.). This Court, however, has already rejected the argument that

---

[6]Some humans naturally have a much more acute sense of smell than others, and humans can be trained to detect and distinguish odors that could not be detected without such training. See E. Hancock, A Primer on Smell, http://www.jhu.edu/jhumag/996web/smell.html. Some individuals employed in the perfume and wine industries, for example, have an amazingly acute sense of smell. *Ibid.*

the use of a drug-sniffing dog is the same as the use of a thermal imaging device.  See *Caballes*, 543 U. S., at 409–410.  The very argument now advanced by the concurrence appears in Justice Souter's *Caballes* dissent.  See *id.*, at 413, and n. 3.  But the Court was not persuaded.

Contrary to the interpretation propounded by the concurrence, *Kyllo* is best understood as a decision about the use of new technology.  The *Kyllo* Court focused on the fact that the thermal imaging device was a form of "sense-enhancing technology" that was "not in general public use," and it expressed concern that citizens would be "at the mercy of advancing technology" if its use was not restricted.  533 U. S., at 34–35.  A dog, however, is not a new form of "technology or a "device."  And, as noted, the use of dogs' acute sense of smell in law enforcement dates back many centuries.

The concurrence suggests that a *Kyllo*-based decision would be "much like" the actual decision of the Court, but that is simply not so.  The holding of the Court is based on what the Court sees as a "'physical intrusion of a constitutionally protected area.'"  *Ante*, at 3 (quoting *United States* v. *Knotts*, 460 U. S. 276, 286 (1983) (Brennan, J., concurring in judgment)).  As a result, it does not apply when a dog alerts while on a public sidewalk or street or in the corridor of a building to which the dog and handler have been lawfully admitted.

The concurrence's *Kyllo*-based approach would have a much wider reach.  When the police used the thermal imaging device in *Kyllo*, they were on a public street, 533 U. S., at 29, and "committed no trespass."  *Ante*, at 3.  Therefore, if a dog's nose is just like a thermal imaging device for Fourth Amendment purposes, a search would occur if a dog alerted while on a public sidewalk or in the corridor of an apartment building.  And the same would be true if the dog was trained to sniff, not for marijuana, but for more dangerous quarry, such as explosives or for a

violent fugitive or kidnaped child. I see no ground for hampering legitimate law enforcement in this way.

## IV

The conduct of the police officer in this case did not constitute a trespass and did not violate respondent's reasonable expectations of privacy. I would hold that this conduct was not a search, and I therefore respectfully dissent.