**THIRD DIVISION**
**MCFADDEN, C. J.,**
**DOYLE, P. J., and HODGES, J.**

**NOTICE: Motions for reconsideration must be
*physically received* in our clerk's office within ten
days of the date of decision to be deemed timely filed.
https://www.gaappeals.us/rules**

*DEADLINES ARE NO LONGER TOLLED IN THIS
COURT.  ALL FILINGS MUST BE SUBMITTED WITHIN
THE TIMES SET BY OUR COURT RULES.*

**September 22, 2020**

# In the Court of Appeals of Georgia

A20A1204. STATE v. DAVIS.                                    HO-043C

HODGES, Judge.

Police arrested Carl Jerome Davis after two individuals were robbed at gunpoint by thieves who drove up next to them in a white pickup truck. Police followed the tracking information from a victim's stolen cell phone to Davis' neighborhood, where they located him in a white pickup truck parked in his driveway. Police ultimately seized a cell phone case, earbuds, and a handgun. Davis moved to suppress the evidence obtained against him on the grounds that it resulted from an illegal search and seizure. The trial court granted his motion, and the State now appeals, contending that (1) the police were authorized to be on Davis' property when the search occurred; (2) the trial court erred in finding that Davis had a reasonable expectation of privacy when in his truck in his driveway; (3) the trial court erred in

finding that the truck was searched while still in the driveway of Davis' home; and

(4) portions of the trial court's findings of fact are not supported by the record. For

the following reasons, we affirm.

At the outset, we acknowledge the standard of review which governs this

appeal:

> When the facts material to a motion to suppress are disputed, it generally is for the trial judge to resolve those disputes and determine the material facts. This principle is a settled one, and [the Supreme Court of Georgia] has identified three corollaries of the principle, which limit the scope of review in appeals from a grant or denial of a motion to suppress in which the trial court has made express findings of disputed facts. First, an appellate court generally must accept those findings unless they are clearly erroneous. Second, an appellate court must construe the evidentiary record in the light most favorable to the factual findings and judgment of the trial court. And third, an appellate court generally must limit its consideration of the disputed facts to those expressly found by the trial court.

(Citations and footnotes omitted.) *Hughes v. State*, 296 Ga. 744, 746 (1) (770 SE2d

636) (2015). "However, where . . . an issue turns on the question of whether a trial

court committed an error of law in granting a motion to suppress, we apply a de novo

standard of review. The appellate court owes no deference to the trial court's

conclusions of law." (Citation and punctuation omitted.) *State v. Criswell*, 327 Ga. App. 377 (759 SE2d 255) (2014).

Here, the trial court made the following factual findings after an evidentiary hearing:

> On January 30, 2019, at approximately 12:20 a.m., the Dekalb County Police were called to the BP Station at 3568 Memorial Drive in reference to an armed robbery that had just occurred across the street at 3553 Memorial Drive. According to the victims, an unknown individual, driving a white Ford F-150 truck, pulled up to where they were parked in front of restaurant on Memorial Drive. An unknown male got out of the back passenger seat, came over to their car, and robbed them at gunpoint and took a wallet and its contents, Apple head phones, a gold necklace, and a cell phone. After taking these items, the individual got back into the rear passenger side of the truck and the unknown driver of the truck left the scene. The victims called 911 and Officer Wade[1] of the Dekalb County Police Department was the first officer to arrive on the scene. After interviewing the victims, who were only able to describe the suspect as black male 5'9", 170 1bs., wearing a black coat, black pants, black hat, and tan boots who got into a white truck, the officer decided to attempt to find the location of the victim's phone

---

[1] The record demonstrates that the trial court clearly erred in identifying Officer Wade as the original responding officer, as it was a different officer, Officer Jones. This discrepancy is immaterial.

3

through the "Find My Phone" app which uses the internal GPS of a cell phone to pinpoint the general whereabouts of that cell phone.

Over an hour after the "Find My Phone" app was turned on, the app showed the victim's cell phone "pinging" in the area of Memorial Drive and Carter Road. Units began circulating around that vicinity. An officer drove down Monterey Drive, which is a residential street in this area and observed a white truck backed into the driveway of a residence at [a specific address on Monterey Drive]. The white truck is owned by [Davis] and [that house on] Monterey Drive is his residence. The "Find My Phone" app did not show the victim's phone "pinging" at [Davis' house], but only in the area. The victim's cell phone was located the following day at [a nearby house], not [Davis' house].

When the officer observed this white truck, he stopped and parked his patrol car on Monterey Drive, a public street. The officer testified that he could not tell if there was anyone in the truck until he was standing in the driveway of [Davis' house]. Once the officer walked onto the driveway, he could not identify who was in the truck or even how many people were inside the truck. He did not approach the truck and ask to speak with the individuals inside, but just grabbed [Davis] from the front driver seat of the truck, detained him, and placed him in the back of his patrol car.

The trial court further found that neither victim was able to identify Davis when brought to his home for a show up, and that police ultimately located a cell phone

case, earbuds, and a handgun in the truck.[2] The trial court found that, following questioning while detained and without the benefit of *Miranda* warnings, Davis admitted the gun found in the truck belonged to him.

Davis was indicted for two counts each of armed robbery, aggravated assault, and possession of a firearm during the commission of a felony. Davis moved to suppress the evidence against him, which the trial court granted on the bases that the police did not have reasonable suspicion to enter Davis' property, Davis had a reasonable expectation of privacy in his truck in his driveway at the time police searched his truck, and no exigent circumstances existed to justify the warrantless search. The State appealed.

1. The State argues that the trial court erred in finding that Davis had a reasonable expectation of privacy in his truck in his driveway. We disagree.

"The Fourth Amendment protects the right of the people to be secure in their persons, houses, papers, and effects against unreasonable searches and seizures." *United States v. Hensley*, 469 U. S. 221, 226 (II) (105 SCt 675, 83 LEd2d 604)

---

[2] We note that the record contains no evidence, and the trial court made no findings, concerning the layout of Davis's property and the location of the driveway relative to the front door of Davis' home. For the reasons discussed more fully herein, the absence of this evidence is not problematic because it is unnecessary for the resolution of the legal issues in this case.

(1985). "The Amendment establishes a simple baseline, one that for much of our history formed the exclusive basis for its protections: When the Government obtains information by physically intruding on persons, houses, papers, or effects, a 'search' within the original meaning of the Fourth Amendment has undoubtedly occurred." (Citations and punctuation omitted.) *Florida v. Jardines*, 569 U. S. 1, 5 (II) (133 SCt 1409, 185 LEd2d 495) (2013).

> [W]hen it comes to the Fourth Amendment, the home is first among equals. At the Amendment's very core stands the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion. This right would be of little practical value if the State's agents could stand in a home's porch or side garden and trawl for evidence with impunity; the right to retreat would be significantly diminished if the police could enter a man's property to observe his repose from just outside the front window. We therefore regard the area immediately surrounding and associated with the home—what [United States Supreme Court] cases call the curtilage—as part of the home itself for Fourth Amendment purposes. That principle has ancient and durable roots.

(Citations and punctuation omitted.) Id. at 6 (II) (A). "'Curtilage' has been defined as the yards and grounds of a particular address, its gardens, barns, and buildings." (Citation and punctuation omitted.) *Landers v. State*, 250 Ga. 808, 809 (301 SE2d

6

633) (1983). "This area around the home is intimately linked to the home, both physically and psychologically, and is where privacy expectations are most heightened." (Citation and punctuation omitted.) *Jardines*, 569 U. S. at 6 (II) (A).

The State justifies the police officers' intrusion onto Davis' driveway on the ground that officers had a particularized and objective suspicion that Davis committed a crime in light of the fact that his truck matched the description given by the victims and was in the vicinity of the stolen cell phone pings.

> Under the Fourth Amendment, there are three tiers of police-citizen encounters: a first-tier encounter involves only voluntary communications between police and citizens without any coercion or detention by law enforcement; a second-tier encounter involves a brief detention of a citizen by police to investigate the possibility that a crime has been or is being committed; and a third-tier encounter is an arrest and must be supported by probable cause.

(Citation omitted.) *State v. Preston*, 348 Ga. App. 662, 664 (824 SE2d 582) (2019).

> To meet the reasonable suspicion standard for conducting a second-tier investigatory detention, the police must have, under the totality of the circumstances, a particularized and objective basis for suspecting that a person is involved in criminal activity. This suspicion need not meet the standard of probable cause, but must be more than mere caprice or a hunch or an inclination.

(Citations and punctuation omitted.) Id. at 664-665.

The State concedes that the officer's interaction with Davis was not a voluntary first-tier encounter, given that the officer immediately forcibly removed Davis from his car and detained him. We need not decide, however, whether police had the requisite reasonable suspicion to initiate a second-tier encounter with Davis. This Court has previously recognized the reasonable expectation of privacy one has in his driveway, which is part of the curtilage of his home. *State v. O'Bryant*, 219 Ga. App. 862, 864 (467 SE2d 342) (1996); see also *State v. Vickers*, 339 Ga. App. 272, 274 (793 SE2d 167) (2016) (physical precedent only). Thus, "even if the officers had [the heightened standard of] probable cause to investigate a crime, the Fourth Amendment prohibited them from entering [Davis'] home *or its curtilage* without a warrant absent consent or a showing of exigent circumstances."[3] (Emphasis supplied.) *Kirsche v.*

---

[3] Although the State makes passing reference to exigent circumstances in its brief on appeal, the State did not argue or attempt to justify the officers' conduct on the basis that they were presented with exigent circumstances. Thus, any such argument has been waived. See *Silver Pigeon Properties, LLC v. Fickling & Co.*, 316 Ga. App. 167, 170 (1) (b), n. 10 (728 SE2d 801) (2012) ("Generally, an argument not raised in the trial court is waived and cannot be raised for the first time on appeal.") (citation and punctuation omitted).

8

*State*, 271 Ga. App. 729, 731 (611 SE2d 64) (2005). Indeed, as our United States Supreme Court has recently held,

> it is a settled rule that warrantless arrests in public places are valid, but, absent another exception such as exigent circumstances, officers may not enter a home to make an arrest without a warrant, *even when they have probable cause*. That is because being arrested in the home involves not only the invasion attendant to all arrests but also an invasion of the sanctity of the home. Likewise, searching a vehicle parked in the curtilage involves not only the invasion of the Fourth Amendment interest in the vehicle but also an invasion of *the sanctity of the curtilage.*

(Emphasis supplied.) *Collins v. Virginia*, — U. S. — (138 SCt 1663, 1672 (II) (B) (2), 201 LEd 2d 9) (2018) (holding that a motorcycle parked in the driveway behind a wall on defendant's property was impermissibly searched).

The State correctly identifies that the prohibition against such entry into the curtilage of a home "is subject to the exception that any visitor, including a police officer, may enter the curtilage of a house when that visitor takes the same route as would any guest, deliveryman, postal employee, or other caller." (Citation omitted.) *Criswell*, 327 Ga. App. at 380 (1). The cases where this exception has been recognized, however, involve first-tier encounters where police seek to "knock and

talk" with the resident of a home. The State has not cited any cases which permitted an officer to traverse the driveway of a home for the purpose of initiating a second-tier encounter and detention.

Indeed, permitting such behavior by police officers would not be in keeping with the justification for the exception, which is a recognition of the implicit license granted to society to approach our homes to communicate with us. The United States Supreme Court expounded on this concept by stating that

> [a] license may be implied from the habits of the country, notwithstanding the strict rule of the English common law as to entry upon a close. We have accordingly recognized that the knocker on the front door is treated as an invitation or license to attempt an entry, justifying ingress to the home by solicitors, hawkers and peddlers of all kinds. *This implicit license typically permits the visitor to approach the home by the front path, knock promptly, wait briefly to be received, and then (absent invitation to linger longer) leave.* Complying with the terms of that traditional invitation does not require fine-grained legal knowledge; it is generally managed without incident by the Nation's Girl Scouts and trick-or-treaters. Thus, a police officer not armed with a warrant may approach a home and knock, precisely because that is no more than any private citizen might do.

(Citation and punctuation, and footnote omitted; emphasis supplied.) *Jardines*, 569 U. S. at 8 (II) (B).

10

When police engage in behavior which is beyond what any private citizen may do, the basis for this exception evaporates. In *Jardines*, the United States Supreme Court found this exception inapplicable when officers brought a trained drug canine on the defendant's front porch to sniff for drugs. As that court explained,

> introducing a trained police dog to explore the area around the home in hopes of discovering incriminating evidence is something else. There is no customary invitation to do *that*. An invitation to engage in canine forensic investigation assuredly does not inhere in the very act of hanging a knocker. To find a visitor knocking on the door is routine (even if sometimes unwelcome); to spot that same visitor exploring the front path with a metal detector, or marching his bloodhound into the garden before saying hello and asking permission, would inspire most of us to—well, call the police. The scope of a license—express or implied—is limited not only to a particular area but also to a specific purpose. . . . Here, the background social norms that invite a visitor to the front door do not invite him there to conduct a search.

(Footnotes omitted; emphasis in original.) Id. at 9 (II) (B). Likewise, here, the background social norms which would have permitted police to traverse Davis' driveway to knock on his door did not permit them to traverse his driveway for the purpose of forcibly removing him from his truck to detain him.

Simply stated, the police were not legally present on Davis' driveway at the time he was detained. The officers were not authorized to enter the curtilage of Davis' home for the purpose of initiating a second-tier encounter absent an exception to the warrant requirement. Accordingly, because all of the evidence against Davis was obtained as a result of an unlawful search and seizure, the trial court did not err in suppressing it. See, e.g., *Wong Sun v. United States*, 371 U. S. 471, 484 (II) (83 SCt 407, 9 LEd2d 441) (1963) ("[E]vidence seized during an unlawful search could not constitute proof against the victim of the search. The exclusionary prohibition extends as well to the indirect as the direct products of such invasions.") (citation and punctuation omitted).

2. In light of our holding in Division 1, we need not address the State's remaining enumerations of error.

*Judgment affirmed. McFadden, C. J., and Doyle, P. J., concur.*