# SUPREME COURT OF THE UNITED STATES

## CLYDE S. BOVAT *v.* VERMONT

### ON PETITION FOR WRIT OF CERTIORARI TO THE SUPREME COURT OF VERMONT

No. 19–1301.   Decided October 19, 2020

The petition for a writ of certiorari is denied.

Statement of JUSTICE GORSUCH, with whom JUSTICE SOTOMAYOR and JUSTICE KAGAN join, respecting the denial of certiorari.

The "knock and talk" is an increasingly popular law enforcement tool, and it's easy to see why. All an officer has to do is approach a home's front door, knock, and win the homeowner's consent to a search. Because everything is done with permission, there's usually no need to bother with a warrant, or worry whether exigent circumstances might forgive one's absence. After all, the Fourth Amendment protects against *unreasonable* searches, and consensual searches are rarely that.

But with the rise of the knock and talk have come more and more cases testing the boundaries of the consent on which they depend. Sometimes, officers appear with overbearing force or otherwise seek to suggest that a homeowner has no choice but to cooperate. Other times, officers fail to head directly to the front door to speak with the homeowner, choosing to wander the property first to search for whatever they can find.

This Court addressed the second sort of problem in *Florida* v. *Jardines*, 569 U. S. 1 (2013). There, the Court recognized that a home's "curtilage," the area immediately surrounding it, is protected by the Fourth Amendment much like the home itself. *Id.,* at 6. So, to comply with the Constitution, law enforcement agents not only need a warrant, exigent circumstances, or consent to enter a

home, they usually need one of those things to reach the home's front door in the first place. After surveying the Fourth Amendment's original meaning and history, *Jardines* acknowledged that a doorbell or knocker on the front door often signals a homeowner's consent allowing visitors to "approach the home by the front path, knock promptly, wait briefly to be received, and then (absent invitation to linger longer) leave." *Id.,* at 8. The Court recognized, too, that law enforcement agents, like everyone else, may take up this "implied license" to approach. But, the Court stressed, officers may not abuse the limited scope of this license by snooping around the premises on their way to the front door. Whether done by a private person or a law enforcement agent, that kind of conduct is an unlawful trespass—and, when conducted by the government, it amounts to an unreasonable search in violation of the Fourth Amendment. On this much, the Court unanimously agreed. See *id.,* at 19 (ALITO, J., dissenting) ("A visitor cannot traipse through the garden, meander into the backyard, or take other circuitous detours that veer from the pathway that a visitor would customarily use"); *id.,* at 20 ("The license is limited to the amount of time it would customarily take to approach the door, pause long enough to see if someone is home, and (if not expressly invited to stay longer) leave").

It's hard to see how the case before us could have been decided without reference to *Jardines*. Suspecting Clyde Bovat of unlawfully hunting a deer at night (Vermont calls it a "deer jacking"), game wardens decided to pay him a visit to—in their words—"investigate further." But the wardens admit that "pretty soon after arriving" they focused on a window in Mr. Bovat's detached garage. Heading there and peering inside, the wardens spotted what they thought could be deer hair on the tailgate of a parked truck.



App. to Pet. for Cert. 53a.

Nor, apparently, was this detour a brief one. According to Mr. Bovat's wife, the wardens lingered on the property for perhaps fifteen minutes and never even made it to the front door. Instead, after watching from inside, *she* finally decided to go out to speak with the wardens—and it was only *then* they finally sought consent for a search. Mrs. Bovat refused the request, but by that point, of course, the whole exercise of seeking consent was pointless—the wardens had all they needed, forget about any knock or talk. They left the property only to return promptly with a search warrant premised on what they had seen through the garage window.

For reasons that remain unclear, the Vermont Supreme Court analyzed the propriety of the wardens' conduct without mentioning *Jardines*. Instead, the court held that the officers' initial visit and search of the property was perfectly appropriate in light of the "plain view" doctrine—the commonsense principle that the Fourth Amendment doesn't normally require an officer to ignore what he sees lying before him. But that doctrine applies only when an officer finds himself in a place he is lawfully permitted to occupy. No one, after all, thinks an officer can unlawfully break into a home, witness illegal activity, and then claim the benefit of the plain view doctrine. So, in an

effort to suggest the wardens' lingering at the garage window was lawful, the Vermont Supreme Court proceeded to cite one of its pre-*Jardines* cases for the notion that driveways constitute "semiprivate areas" within the curtilage, and "'observations made from such'" areas "'are not covered by the Fourth Amendment.'" 2019 VT 81, ¶18, 224 A. 3d 103, 108 (quoting *State* v. *Pike*, 143 Vt. 283, 288, 465 A. 2d 1348, 1351 (1983)). The upshot? Under the court's logic, it seems, an officer who keeps ten toes in a home's driveway may stay and search just as he pleases.

None of this is easy to square with *Jardines,* and that case's teachings almost certainly required a different result. Maybe a court could have discredited Mrs. Bovat's testimony about how long the wardens wandered around the garage. Maybe a court could have attempted to offer some explanation why items viewable only through a garage window were within the "plain view" of visitors proceeding directly and without delay from the street to the front door. But it seems a good deal more likely that any court applying *Jardines* would have agreed with Chief Justice Reiber, who explained in dissent that the wardens exceeded the scope of their implied license to approach the front door by heading to the garage and spending so much time peering through its window. As Chief Justice Reiber noted, *Jardines* plainly held that the home's curtilage and observations made anywhere within its bounds *are* covered by the Fourth Amendment; no exceptions. And the Fourth Amendment hardly tolerates the sort of meandering search that took place here. The wardens violated the Constitution, and the warrant they received premised on the fruits of their unlawful search was thus tainted.

Despite the Vermont Supreme Court's error, I acknowledge that understandable reasons exist for my colleagues' decision to let this case go. For one, it is unclear whether *Jardines*'s message about the protections due a home's curtilage has so badly eluded other state or federal

courts. For another, there might be reason to hope that, while Vermont missed *Jardines* in one deer-jacking case, its oversight will prove a stray mistake. But however all that may be, the error here remains worth highlighting to ensure it does not recur. Under *Jardines*, there exist no "semiprivate areas" within the curtilage where governmental agents may roam from edge to edge. Nor does *Jardines* afford officers a fifteen-minute grace period to run around collecting as much evidence as possible before the clock runs out or the homeowner intervenes. The Constitution's historic protections for the sanctity of the home and its surroundings demand more respect from us all than was displayed here.