IN THE COURT OF APPEALS OF NORTH CAROLINA

No. COA23-711

Filed 17 December 2024

Guilford County, Nos. 20CRS79581-83

STATE OF NORTH CAROLINA

      v.

QUASHAUN MELSUN REEL, Defendant.

Appeal by defendant from judgment entered 3 February 2023 by Judge William A. Wood II in Superior Court, Guilford County. Heard in the Court of Appeals 6 February 2024.

> *Attorney General Joshua H. Stein, by Special Deputy Attorney General John A. Payne, for the State.*
>
> *Appellate Defender Glenn Gerding, by Assistant Appellate Defender Jillian C. Franke, for defendant-appellant.*

STROUD, Judge.

This appeal arises from the trial court's denial of a motion filed by Defendant in which he sought to suppress evidence underlying several drug and weapon charges brought against him. Based on the applicable standard of review, we must overrule Defendant's arguments and affirm the trial court's order.

## I. Factual Background and Procedural History

On 14 September 2020, Defendant was indicted for the following drug related charges at issue in this appeal: in case file 20 CRS 79581: trafficking a schedule I

controlled substance (heroin), possession with intent to sell or deliver a schedule I controlled substance (heroin), possession with intent to sell or deliver a schedule I controlled substance (MDMA); in case file 20 CRS 79582: possession with intent to sell or deliver a schedule VI controlled substance (marijuana), possession of a schedule VI controlled substance (marijuana), and possession of drug paraphernalia; and in case file 20 CRS 79583: possession with intent to sell and deliver a schedule I controlled substance (heroin) within 1000 feet of a school.

On 10 May 2021, Defendant was indicted on several more charges: in case file 21 CRS 70148, possession of a firearm by a felon; in 21 CRS 70149, possession with intent to sell or deliver a schedule VI controlled substance (marijuana) and carrying a concealed firearm; and in case file 21 CRS 70150, maintaining a dwelling to keep and sell a controlled substance (heroin).[1]

On 14 September 2022, Defendant filed a motion to suppress statements he made and contraband discovered during a search of Defendant's residence on 6 August 2020. That motion and other pretrial matters came on for hearing on 6 December 2022 in Superior Court, Guilford County. On 12 December 2022, the trial court entered an order denying the motion to suppress; the order contained three dozen findings of fact.

---

[1] On 10 October 2022, superseding indictments were filed in 20 CRS 79581, 20 CRS 79583, and 21 CRS 70150, changing the controlled substance from heroin to fentanyl. Also on 10 October 2022, an additional indictment was filed in 22 CRS 26050, charging Defendant with two counts of trafficking between four and thirteen grams of fentanyl.

The unchallenged portions of the trial court's findings indicate that on 24 July 2020, the High Point Police Department ("HPPD") received a complaint regarding "drugs[ and ]narcotics" at 1506-A Leonard Avenue. On 4 August 2020, an anonymous tip received through Crime Stoppers alleged that illegal drugs were being sold by an unnamed male at the same residence, with "people . . . in and out of the residence constantly, day and night." Both reports were passed along to HPPD Officer Brian Hilliard[2] with a directive to "check the address[.]"

Hilliard learned that Defendant was listed on the utility accounts for the address and decided to conduct a "knock and talk" at the residence on 6 August 2020. On that date, when Hilliard and two other officers arrived at Defendant's home in an unmarked police car, they saw no cars in the driveway and no apparent activity. The officers decided to drive around the block, eventually arriving on a road that runs along the side of the home, where they parked. When a grey Acura pulled into the driveway of the home, Hilliard got out of his car and walked toward the female visitor who got out of the car. Hilliard spoke to the visitor, although she did not respond to him. Hilliard then followed the visitor to the front door of the home.

Defendant answered the door after the visitor opened the storm door and knocked. Hilliard, who was standing "just behind" the visitor, two feet from the

---

[2] The order indicates that at the time the suppression hearing, Hilliard held the rank of lieutenant. At the time of his encounter with Defendant, however, Hilliard was an officer with the HPPD street crimes unit.

doorway, "detected the strong odor of marijuana emanating from the residence[.]" The visitor entered the home, and the door was closed. Hilliard perceived that the door was being braced to prevent entry, and the combination of these circumstances caused Hilliard to believe that "drugs could be destroyed if he did not immediately gain entry."

Hilliard then verbally identified himself as a law enforcement officer and gave a command for the door to be opened. When that command was not heeded, he attempted but failed to "shoulder" the door open. Another officer was able to kick the door open, and officers entered the home. Defendant and the visitor were handcuffed and detained, and officers discovered "[a] bag of marijuana, a bag of pills[,] and a digital scale were in plain view inside the residence directly beside the front door."

Based on its factual findings, the trial court made twenty-three conclusions of law, including that the "knock and talk" by Hilliard did not rise to the level of a Fourth Amendment search and that probable cause and exigent circumstances justified the warrantless search of Defendant's home. Accordingly, the trial court held that Defendant's constitutional rights were not violated and denied his motion to suppress.

Defendant reserved his right to appeal the denial of his motion to suppress. On 26 January 2023, he pled guilty, under an agreement with the State, to five charges: two counts of trafficking fentanyl and one count each of possession with the intent to sell or deliver fentanyl, possession with intent to sell or deliver MDMA, and

possession of a firearm by a felon. The remaining charges were dismissed, and the trial court consolidated the convictions for sentencing, imposing an active term of 225-282 months and a fine of $500,000.

## II. Analysis

Defendant argues that the trial erred by denying his motion to suppress under the "knock and talk" exception to the Fourth Amendment and by concluding that the officers' warrantless entry into Defendant's home was justified by probable cause and exigent circumstances.

### A. Standard of Review

"In reviewing a motion to suppress evidence, [the Court of Appeals] examines whether the trial court's findings of fact are supported by competent evidence and whether those findings support the conclusions of law. Conclusions of law are reviewed de novo." *State v. Alvarez*, 385 N.C. 431, 433, 894 S.E.2d 737, 738 (2023) (citations omitted). In conducting this review, "we examine the evidence introduced at trial in the light most favorable to the State." *State v. Hunter*, 208 N.C. App. 506, 509, 703 S.E.2d 776, 779 (2010) (citations omitted).

A reviewing court is "bound by the trial court's findings of fact if such findings are supported by competent evidence in the record," *State v. Smith*, 346 N.C. 794, 797, 488 S.E.2d 210, 212 (1997), and "[c]onclusions of law that are correct in light of the findings are also binding on appeal[,]" *State v. Howell*, 343 N.C. 229, 239, 470 S.E.2d 38, 43 (1996) (citation omitted). "This deference is afforded the trial judge

because he is in the best position to weigh the evidence, given that he has heard all of the testimony and observed the demeanor of the witness." *State v. Hughes*, 353 N.C. 200, 207, 539 S.E.2d 625, 631 (2000).

## B. Challenged Findings of Fact

Defendant contends that all or portions of four findings of fact in the suppression order are not supported by competent evidence.

Finding of fact 11 - Defendant first maintains no competent evidence indicated that Hilliard parked "in the same area" as the Acura, which he maintains had parked in the driveway of his home. Defendant notes that Hilliard's testimony and a surveillance video admitted at the suppression hearing indicate that Hilliard approached the home from the side. We note that the preceding finding, finding of fact 10, identifies Defendant's home as a duplex and states that the Acura "pulled into the driveway or adjacent parking area[.]" Hilliard testified that he had parked in a "driveway, slash, cut-through that cuts through a cemetery that runs directly beside" Defendant's home. This description is consistent with a photo of Defendant's home included in Defendant's brief, which shows the "cut-through" as running roughly as close to the left side of the duplex as the driveway does on the right side of the building. For purposes of our resolution of Defendant's appeal, we will presume the trial court's reference to "the same area" referred to the area "directly beside" Defendant's home where the parties agree Hilliard was in fact parked and from which it is undisputed he saw the Acura pull into Defendant's driveway/parking area.

Similarly, Defendant takes issue with the court's finding that Hilliard "approached the Acura," emphasizing that "[t]his is not seen on the surveillance video, which shows Hilliard walking up from a different direction (the left side of the house) and walking straight to the front door." Hilliard testified that he "approached the Acura," which he described as being parked "approximately . . . ten feet from" Defendant's front door. Based on the testimony, the video showing the layout of the area, and the photo in Defendant's brief, for purposes of resolving this appeal, we read this finding of fact as indicating that Hilliard walked toward the Acura and then—as stated in unchallenged findings of fact 13, 14, and 17—followed closely behind the Acura's driver as she approached Defendant's front door.

Findings of fact 12 and 25- Defendant contends that although the trial court found that during the encounter with Defendant, Hilliard was wearing police attire that said "POLICE" across the chest, the surveillance video shows that Hilliard was wearing a plain black police uniform. The transcript from the suppression hearing reveals that Hilliard testified that he and the other officers in the street crimes unit of the HPPD wear "not a typical police uniform. It is a blue or black shirt with a police vest, a black vest that says 'police' across the chest, and BDU-style pants." Nonetheless, the State concedes that the word "POLICE" appeared on the back rather than the front of the officers' uniforms as depicted in the surveillance video.

However, the surveillance video also reveals that the officers were in police uniforms with badges on the front and insignia on the sleeves. We further note that

Defendant, Hilliard, and the trial court agree on the point critical to our analysis below—that Hilliard was wearing clothing which clearly identified him from the front as a law enforcement officer.

Finding of fact 21- The court found that "the door was immediately slammed shut" after the female visitor entered Defendant's home. Defendant contends that "[t]he surveillance video shows that [Defendant] attempted to close the door but it was stopped by Hilliard at first. [Defendant] then successfully closed it." Hilliard testified that Defendant "immediately slammed the door" after the visitor entered— and after Hilliard had already detected "a strong odor of marijuana" "waft[ing]. . . from. . . the inside of the house[.]" But the trial court's finding of fact is supported by the evidence, whether Defendant "immediately slammed the door" completely shut or immediately tried to close the door, was briefly stopped by Hilliard, and then succeeded in closing the door completely.

## C. Challenged Conclusions of Law

Defendant next identifies six conclusions of law which he contends are erroneous:

> 6. Officer Hilliard's approach to the front entrance of 1506-A Leonard Ave., was legal in every way.
>
> . . . .
>
> 17. Officer Hilliard was in police attire with the word "POLICE" emblazoned on his chest and positioned approximately two feet from the doorway when it was opened by [Defendant]. Upon his slamming the door shut

immediately when the female entered the residence, it was objectively reasonable of the officers to believe that the possessors of the contraband were aware of the close presence of law enforcement and were intent on moving or destroying that contraband.

18. Given the totality of the circumstances, sufficient exigent circumstances existed for the officers to force entry into the residence located at 1506-A Leonard Ave. without a search warrant.

19. The officers had both probable cause and exigent circumstances to force entry into 1506-A Leonard Ave. on August 6, 2020, without a search warrant.

20. Defendant's rights guaranteed by the Fourth Amendment to the United States Constitution were not violated.

21. None of Defendant's constitutional rights were violated.

Defendant argues these conclusions are not supported in that "the trial court erred by denying [Defendant's] motion to suppress under the 'knock and talk' exception where no implied license existed to cut through [Defendant's] side yard and attempt to follow an invited guest into his home" and "by holding that the officers' warrantless entry into [Defendant's] home was supported by probable cause and justified by exigent circumstances." As explained below, we find these contentions without merit.

### 1. *Knock and Talk Exception to the Fourth Amendment*

As the United States Supreme Court has stated, "when it comes to the Fourth Amendment, the home is first among equals. At the Amendment's very core stands the right of a man to retreat into his own home and there be free from unreasonable

governmental intrusion." *Florida v. Jardines*, 569 U.S. 1, 6, 185 L. Ed. 2d 495, 501 (2013) (citation and quotation marks omitted). This constitutional protection includes "the area immediately surrounding and associated with the home—what our cases call the curtilage—as part of the home itself for Fourth Amendment purposes." *Id.* (citation and quotation marks omitted).

"A 'knock and talk' is a procedure by which police officers approach a residence and knock on the door to question the occupant, often in an attempt to gain consent to search when no probable cause exists to obtain a warrant." *State v. Marrero*, 248 N.C. App. 787, 790, 789 S.E.2d 560, 564 (2016) (citation omitted). This procedure is constitutionally permissible because "no search of the curtilage [of a home] occurs when an officer is in a place where the public is allowed to be, such as at the front door of a house." *State v. Lupek*, 214 N.C. App. 146, 151, 712 S.E.2d 915, 919 (2011). "Put another way, law enforcement may do what occupants of a home implicitly permit anyone to do, which is approach the home by the front path, knock promptly, wait briefly to be received, and then (absent invitation to linger longer) leave." *State v. Huddy*, 253 N.C. App. 148, 151-52, 799 S.E.2d 650, 654 (2017) (citation and quotation marks omitted).

This Court has emphasized, however, that "law enforcement may not use a knock and talk as a pretext to search the home's curtilage. . . . [and] the knock and talk doctrine does not permit law enforcement to approach *any* exterior door to a home." *Id.* at 152, 799 S.E.2d at 654 (emphasis in original) (citations omitted). In

*Huddy*, for example, an officer was held to have exceeded the scope of a knock and talk where he "ran a license plate on a car whose license plate was not visible from the street, checked windows for signs of a break-in, and walked around the entire residence to 'clear' the sides of the home before approaching the back door." *Id.* at 153, 799 S.E.2d at 655.

This Court also found that officers exceeded the scope of a constitutional knock and talk where they "cut across a person's front yard, swiftly passing a no trespassing sign, and emerge from trees they were using for cover and concealment in order to illuminate, surround, and stop [the resident's] departing car" on a dark winter evening. *State v. Falls*, 275 N.C. App. 239, 240, 853 S.E.2d 227, 229 (2020). One of the officers testified about their route of approach:

> The sidewalk would be what anybody that was going door-to-door selling anything would take, they would go down -- up the little sidewalk that jets off the driveway.
>
> There was not a worn path in the grass where we walked, or anything like that. I would think anybody, especially if you parked your vehicle on the roadway, you would go down the driveway. We did -- just because of the freedom of movement, and stuff, we're not going to block the driveway. We don't like parking our patrol cars on the road. So that's why we took the path we did. If you were in a mail truck you would probably stop at the driveway and go down the sidewalk to the door. But that's not the path that we took.

*Id.* at 242, 853 S.E.2d at 230-31 (brackets and ellipses omitted).

This Court emphasized that "[t]he scope of the implied license to conduct a knock and talk is governed by societal expectations, and when law enforcement approach a home in a manner that is not customary, usual, reasonable, respectful, ordinary, typical, nonalarming, they are trespassing, and the Fourth Amendment is implicated." *Id.* at 248, 853 S.E.2d at 234 (citation and quotation marks omitted). The Court then noted three pertinent circumstances in that case "[r]elevant to distinguishing between a knock and talk and a search[:] . . . how law enforcement approach the home, the hour at which they did so, and whether there were any indications that the occupant of the home welcomed uninvited guests on his or her property." *Id.* In *Falls*, because the officers had approached the residence in dark, unmarked clothing, after darkness had fallen, through the side yard and past a "no trespassing" sign rather than by the driveway or walkway to the front door, this Court held that "[t]he officers . . . strayed beyond the bounds of a knock and talk[.]" *Id.* at 254, 853 S.E.2d at 238.

We agree with Defendant that the analysis in *Falls* is helpful, but we find the facts of that case easily distinguishable from the matter before us. Defendant emphasizes that Hilliard parked his car "on an adjacent street to the left of his house, out of view," walked through Defendant's side yard, and then "once at the door, . . . stood less than two feet away from [Defendant's] invited guest." Defendant maintains these acts "flouted 'background social norms' and exceeded what a 'reasonably respectful citizen' would do[.]" We disagree.

- 12 -

The street or "cut-through" where the officers parked was directly adjacent to Defendant's home, and nothing suggested that parking on that street as opposed to the street in front of the home or in its driveway was unusual, much less unreasonable or not respectful. Additionally, although Hilliard cut across the side yard of the building to reach the path to the front door, this Court in *Falls* noted that "there may be circumstances where cutting across a person's yard does not exceed the scope of the implied license[.]" *Id.* at 253, 853 S.E.2d at 237 (citation omitted). Hilliard testified that he approached the visitor as she made her way to Defendant's front door, speaking to her, did not stop or cut in front of her, and then followed her to the front door. Hilliard's testimony that he stood about two feet behind the visitor suggests that Hilliard may have been holding open a storm door which the visitor had opened as she knocked on Defendant's door.

In any event, other than his walking through Defendant's side yard, nothing about Hilliard's approach is like that of the officers in *Falls*. *See id.* at 242, 853 S.E.2d at 230-31. The visit was made during the day, Hilliard's attire indicated that he was a law enforcement officer, and he followed the visitor to the front door. Considering "societal expectations," *id.* at 248, 853 S.E.2d at 234, Hilliard approached Defendant's house in a way that was "customary, usual, reasonable, respectful, ordinary, typical, [and] nonalarming," *Id.* (citation and quotation marks omitted). Thus, Hilliard did not exceed the scope of a knock and talk and transform his presence at Defendant's front door into a search for Fourth Amendment purposes.

Accordingly, we turn to whether, during the knock and talk, circumstances arose which justified and made constitutionally permissible Hilliard's subsequent warrantless entry into Defendant's home.

### 2. *Probable Cause and Exigent Circumstances*

> The Fourth Amendment dictates that a governmental search and seizure of private property unaccompanied by prior judicial approval in the form of a warrant is *per se* unreasonable unless the search falls within a well-delineated exception to the warrant requirement. The existence of probable cause and exigent circumstances is one such exception.

*Marrero*, 248 N.C. App. at 794, 789 S.E.2d at 566 (citations, quotations marks, and ellipsis omitted).

"Probable cause refers to those facts and circumstances within an officer's knowledge and of which he had reasonably trustworthy information which are sufficient to warrant a prudent man in believing that the suspect had committed or was committing an offense." *State v. Williams*, 314 N.C. 337, 343, 333 S.E.2d 708, 713 (1985) (citations omitted). As the State notes, this Court has held that the "plain smell" of marijuana emanating from a location alone "provide[s] sufficient probable cause to support a search[.]" *State v. Corpening*, 200 N.C. App. 311, 315, 683 S.E.2d 457, 460 (2009).

Here, unchallenged findings of fact 18 and 19 state that Hilliard, an experienced law enforcement officer who had worked on "several hundred drug investigations" and was "familiar with the smell of marijuana[,]" "detected the strong

odor of marijuana emanating from the residence in a 'waft' of air that left the residence upon the main door being opened." Thus, the plain smell of marijuana wafting from the front door constituted probable cause.

"An exigent circumstance is found to exist in the presence of an emergency or dangerous situation. The State has the burden of proving that exigent circumstances necessitated the warrantless entry. Determining whether exigent circumstances exist depends on the totality of the circumstances." *Marrero*, 248 N.C. App. at 794, 789 S.E.2d at 566 (citations, quotations marks, and brackets omitted). Moreover, we consider "objective factors, rather than subjective intent" in making this determination. *Id.* at 795, 789 S.E.2d at 566 (citation omitted). Among the factors to be considered are

> (1) the degree of urgency involved and the time necessary to obtain a warrant; (2) the officer's reasonably objective belief that the contraband is about to be removed or destroyed; (3) the possibility of danger to police guarding the site; (4) information indicating the possessors of the contraband are aware that the police are on their trail; and (5) the ready destructibility of the contraband.

*Id.* (citation and quotation marks omitted).

Here, the trial court found that Hilliard: was following up two reports of drugs sales by a male at the home via the knock and talk and smelled marijuana emanating from the front door; was wearing his police uniform and standing only two feet behind the visitor when Defendant answered the door, admitted the visitor, and then closed the door, leaving Hilliard outside; perceived someone inside the residence was

Opinion of the Court

"placing a brace on the door to prevent others from entering"; identified himself as a law enforcement officer; and commanded the door be opened, but it was not. "Given these findings, it is objectively reasonable to conclude that an officer in [Hilliard's] position would have worried that [D]efendant would destroy evidence when he . . . left the scene to obtain a search warrant, especially given the ready destructibility of marijuana." *Id.* at 796, 789 S.E.2d at 567.

We also reject Defendant's proposal that after detecting the smell of marijuana wafting from the door, "Hilliard merely had probable cause for possession of marijuana, a misdemeanor" and "could have attempted to detain [Defendant] and his invited guest outside." First, since Hilliard was conducting the knock and talk to investigate multiple complaints of drug sales from the residence, the odor of marijuana wafting out when Defendant opened the front door suggested possible drug trafficking by sale rather than simple possession. After Defendant closed the door to Hilliard after admitting the visitor, appeared to be bracing the door, and did not respond to Hilliard's command that the door be opened, it is unclear how Hilliard could have detained Defendant outside the home.

### III.   Conclusion

The evidence at the suppression hearing supported the trial court's pertinent findings of fact, which in turn supported its conclusions of law. Further, the trial court did not err in concluding that the knock and talk here did not rise to the level of a Fourth Amendment search or that probable cause and exigent circumstances

- 16 -

justified the warrantless entry into Defendant's home.  Accordingly, the trial court's order denying Defendant's motion to suppress is affirmed.

AFFIRMED.

Judge GRIFFIN concurs.

Judge THOMPSON dissents by separate opinion.

THOMPSON, Judge, dissenting.

I respectfully dissent from the majority opinion and agree with defendant's contentions regarding the following findings of fact and conclusions of law:

## A.    Challenged Findings of Fact

On appeal, defendant contends that the trial court erred in denying his motion to suppress and challenged four findings of fact in the trial court's order denying his motion to suppress.

Defendant first challenged Finding of Fact 11, which says, "Officer Hilliard parked his patrol car in the same area. He exited his vehicle and approached the Acura." After reviewing the record, I would conclude that this finding of fact is not supported by competent evidence. Officer Hilliard's testimony indicates that Ms. Hemsley, who was driving the gray Acura, parked in defendant's driveway, while Officer Hilliard parked his car on the side street to the right of defendant's residence—between defendant's residence and the cemetery. Therefore, Officer Hilliard was not parked in the same area. Furthermore, the video footage shows that Officer Hilliard walked straight from the side street onto defendant's front porch, and he never approached the gray Acura. Thus, I would conclude that this finding of fact is not supported by competent evidence.

Defendant next challenged Finding of Fact 12, which says, "Officer Hilliard was in police attire with the word 'POLICE' emblazoned across the chest of his

uniform." After reviewing the video footage from defendant's front porch, I would conclude that this finding of fact is not entirely supported by competent evidence. As seen in the video footage, there are no words "emblazoned" across Officer Hilliard's chest. Instead, there is a badge on the left side of Officer Hilliard's chest, a radio clipped to his shirt in the middle of his chest, and on the right side of his chest is what appears to be his last name. With that being said, I do believe there is competent evidence to support a finding of fact that "Officer Hilliard was in police attire[.]"

Defendant's third challenged finding, Finding of Fact 21, says, "The door was immediately slammed shut." After reviewing the evidence, I would conclude that this is not supported by competent evidence. The video footage shows that as defendant attempted to shut his front door, his attempt was thwarted by Officer Hilliard stopping the door with his foot.

Defendant's final challenged finding of fact is Finding of Fact 25, which says,

> Officer Hilliard, who was still wearing his uniform with the word 'POLICE' emblazoned across the front, identified himself verbally as a High Point Police Officer and began to give commands for the door to be opened. Several commands were given. The door was not opened. Officer Hilliard attempted unsuccessfully, to shoulder the door open.

After reviewing the evidence, I would conclude that this finding of fact is only partially supported. The only portion of this finding of fact that is supported by competent evidence is that Officer Hilliard gave several commands for the door to be opened. However, the rest of this finding of fact is not supported by competent

2

evidence. As mentioned above, the word "POLICE" was not "emblazoned" across Officer Hilliard's chest. Secondly, Officer Hilliard unsuccessfully attempted to *kick* defendant's door, not shoulder it. And most importantly, at no point before Officer Hilliard and Officer Finn forcefully gained entry into defendant's residence did either officer, Hilliard or Finn, identify themselves as law enforcement officers with HPPD.

Although the majority of the above-mentioned findings of fact are unsupported by competent evidence, the crux of this dissent is in the following discussion.

**B.    Conclusions of Law**

Defendant challenged several of the trial court's conclusions of law, but because "[c]onclusions of law are reviewed de novo and are subject to full review[,]" *State v. Huddy*, 253 N.C. App. 148, 151, 799 S.E.2d 650, 654 (2017) (citation omitted), the focus of my dissent is on Conclusion of Law 2. Conclusion of Law 2 says, "Officer Hilliard and the other officers were not using the 'knock and talk' as a pretext to search the home or the curtilage to the home." However, after reviewing the record de novo, I would conclude that Officer Hilliard and the other officers did precisely that.

Under the knock and talk doctrine, "law enforcement may do what occupants of a home implicitly permit anyone to do, which is approach the home by the front path, knock promptly, wait briefly to be received, and then (absent invitation to linger longer) leave." *Id.* at 151–52, 799 S.E.2d at 654 (citation omitted). "Importantly, law enforcement may not use a knock and talk as a pretext to search the home's

curtilage." *Id.* "No one is impliedly invited to enter the protected premises of the home in order to do nothing but conduct a search." *Id.* (internal quotation marks and citation omitted).

After reviewing the evidence, I would conclude that Officer Hilliard, and the other HPPD officers, used the alleged "knock and talk" as a pretext to search defendant's curtilage. The HPPD Chief of Police, Travis Stroud (Stroud), instructed the "Patrol Commanders" to "coordinate amongst [themselves] and conduct a [k]nock and [t]alk" or utilize "some sort of enforcement action" at defendant's residence because the "complaints [we]re probably valid."[3] However, the video footage from defendant's front porch makes it evidently clear that neither Officer Hilliard nor Officer Finn ever knocked on defendant's door, nor did they, at any point, announce their presence on defendant's front porch or announce themselves as law enforcement officers with the HPPD. Instead, the evidence tends to show that Officer Hilliard and Officer Finn in fact utilized a different "sort of enforcement action." The video footage from defendant's front porch shows that Officer Hilliard lingered behind Ms. Hemsley after *she* knocked on defendant's storm door and waited to be invited in. In the video footage, Officer Hilliard is seen standing behind Ms. Hemsley and as she opened the storm door to go inside defendant's residence, Officer Hilliard quickly stepped

---

[3] HPPD received two complaints (one from City Hall on 24 July 2020 and one from Crime Stoppers on 4 August 2020) regarding potential drugs/narcotics being sold from defendant's residence.

4

forward, grabbed the storm door and continued in Ms. Hemsley's footsteps until he was standing in the doorway of defendant's home—an area that defendant did not invite Officer Hilliard to be in. Furthermore, Officer Hilliard testified that he believed that defendant was unaware of police presence on his front porch, and this is corroborated by defendant's testimony that he was unaware of police presence on his front porch.

By not conducting the "knock and talk" and attempting to piggyback off of Ms. Hemsley's invitation into defendant's home, the HPPD officers usurped defendant's opportunity to decline to receive the officers. *See Huddy*, at 151–52, 799 S.E.2d at 654 (explaining that the proper execution of a "knock and talk" consists of law enforcement approaching the front door of a home, knocking, waiting briefly to be received, and potentially (if invited to linger longer) engage in *consensual* conversation with the occupant(s)). Indeed, the HPPD officers were not "invited to enter the protected premises" of defendant's home, *id.* at 152, 799 S.E.2d at 654, and a "consensual conversation with" defendant never occurred. *Id.* Instead, when defendant shut the door on Officer Hilliard—an uninvited visitor—Officer Hilliard's initial response was an unsuccessful attempt to kick in defendant's door. Following Officer Hilliard's unsuccessful attempt to kick defendant's door in, he gave defendant several commands to open the door, and when defendant did not comply, Officer Finn kicked the door in. During this time, as Officer Hilliard's testimony indicates, he saw defendant and Ms. Hemsley were standing just on the other side of the door, and

5

defendant can be heard repeatedly asking the officers what they were doing. Therefore, the evidence shows that Officer Hilliard never attempted to "remedy the situation before going any further," which he testified was the purpose of a "knock and talk." Instead, Officer Hilliard used the alleged "knock and talk" as a pretext to search the curtilage of defendant's home, which is precisely what our case precedent says law enforcement cannot do. *See Huddy*, *id.* at 152, 799 S.E.2d at 654.

"When the Government obtains information by physically intruding on persons, houses, papers, or effects, a 'search' within the original meaning of the Fourth Amendment has undoubtedly occurred." *Florida v. Jardines*, 569 U.S. 1, 5, 133 S. Ct. 1409, 1414 (2013) (internal quotation marks and citation omitted). And "when it comes to the Fourth Amendment, the home is first among equals." *Id.* at 6, 133 S. Ct. at 1414. "At the Amendment's very core stands the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion." *Id.* (internal quotation marks and citation omitted). "This right would be of little practical value if the State's agents could stand in a home's porch or side garden and trawl for evidence with impunity; the right to retreat would be significantly diminished if the police could enter a man's property to observe his repose from just outside the front [door]." *Id.* "We therefore regard the area immediately surrounding and associated with the home—what our cases call the curtilage—as part of the home itself for Fourth Amendment purposes." *Id.* (internal quotation marks and citation omitted). The curtilage of "the home is intimately linked to the home, both physically

and psychologically, and is where privacy expectations are most heightened." *Id.* at 7, 133 S. Ct. at 1415 (internal quotation marks and citation omitted). And, "[t]he front porch is the classic exemplar of an area adjacent to the home and to which the activity of home life extends." *Id.* (internal quotation marks and citation omitted). "As a result, law enforcement ordinarily cannot enter the curtilage of one's home without either a warrant or probable cause and the presence of exigent circumstances that justify the warrantless intrusion." *Huddy*, 253 N.C. App. at 151, 799 S.E.2d at 654.

Yet here, without a warrant or probable cause, the HPPD law enforcement officers physically intruded on defendant's front porch to obtain information. The HPPD officers trawled for evidence *and* observed defendant from just outside his front door (eventually observing him from inside defendant's front doorway), without ever knocking or announcing their presence. For the foregoing reasons, I would conclude that the trial court erred by denying defendant's motion to suppress because the "knock and talk" exception to the Fourth Amendment warrant requirement is inapplicable, and defendant's Fourth Amendment right to be free from unreasonable searches and seizures was violated. I respectfully dissent.